LEE WOMACK *et al.*, Indiv. and d/b/a Douglas Tap, Plaintiffs-Appellants, v. THE LOCAL LIQUOR CONTROL COMMISSION OF THE CITY OF ELGIN *et al.*, Defendants-Appellees.

Second District No. 2—91—0715

Opinion filed May 29, 1992.

Marmarie J. Kostelny, of Zimmerman, Smith & Kostelny, of Elgin, and Cynthia M. Alexander, of Law Offices of Cynthia M. Alexander, of Waukegan, for appellants.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Claudia Sainsot, Assistant Attorney General, of Chicago, of counsel), for appellee Illinois Liquor Control Commission.

Erwin W. Jentsch, Michael R. Gehrman, and Barbara Oklesen, Assistant Corporation Counsel, of Elgin, for other appellees.

JUSTICE GEIGER delivered the opinion of the court:

On April 25, 1990, the plaintiffs, Lee Womack and his son, Wyndell Douglas Womack, applied for a renewal of their liquor license for the Douglas Tap (the tavern), located at 158 North Street in Elgin. The City of Elgin (the City) opposed the renewal. On May 22, 1990, after a hearing, the Local Liquor Control Commission of the City of Elgin (the Commission) denied the application. On July 18, 1990, the State of Illinois Liquor Control Commission (the State Commission) affirmed the denial. The plaintiffs filed a complaint for administrative review (see Ill. Rev. Stat. 1989, ch. 110, par. 3—101 *et seq.*) in the cir-

cuit court of Kane County. The circuit court affirmed the decision of the State Commission.

The plaintiffs brought this appeal from the circuit court's affirmance. They argue (1) that there is a lack of evidence to support the Commission's findings; and (2) that the Commission abused its discretion in refusing to renew the license. We affirm.

The plaintiffs have operated the tavern since 1982 and each owns a 50% interest in it. Immediately east of the tavern, at 160 North Street, is the Elgin Inn; it has been boarded up since early 1990. Immediately west of the tavern is a fenced-in lot. There are commercial buildings and lots across the street from the Douglas Tap. The Elgin police department is located slightly more than a block west of the tavern.

On April 25, 1990, the plaintiffs filed an application for renewal of their Douglas Tap liquor license. The City opposed the application, and on May 21, 1990, the Commission held a hearing on the renewal. In summary, the following evidence was presented at the hearing.

Several Elgin police officers testified about making drug-related arrests in or near the Douglas Tap. Detective Sergeant Mark Brictson testified that he had arrested a person named Terry Sykes twice, once in March 1989 and again in November 1989. The first time, Brictson arrested Sykes for possession of cocaine as Sykes was about to enter the tavern. On the second occasion, Brictson arrested Sykes inside the tavern premises on an outstanding arrest warrant. When he informed Sykes that Sykes was under arrest, Sykes pushed Brictson aside and threw a package containing cocaine behind the bar. The cocaine weighed approximately five grams and was packaged for sale.

On cross-examination, Brictson acknowledged that when he entered the Douglas Tap to arrest Sykes in November 1989, he did not see any narcotics in Sykes' possession until after he attempted the arrest. Sykes was carrying the cocaine in a jacket pocket, and Brictson conceded that since he had not been able to see the cocaine, others also would have had difficulty seeing it. Brictson acknowledged that no employees hindered his making the arrest and that, in fact, the bartender on duty assisted by retrieving the cocaine that Sykes attempted to discard.

Brictson also testified that on December 4, 1989, he arrested Edwin Gomez, who was standing on the sidewalk between 158 and 160 North Street. Brictson searched Gomez and seized heroin with a street value of about $75. On cross-examination, Brictson acknowledged that the police report of that incident, which was admitted into evidence at the hearing, did not mention the Douglas Tap.

On April 14, 1990, Brictson arrested Charles Stokes after he saw Stokes leave the Douglas Tap. Stokes was wanted for an outstanding drug charge, and Brictson began chasing him. While running, Stokes discarded a syringe and a packet containing one-quarter gram of cocaine.

Detective Sergeant Brictson and Officer Jesse Padron cooperated in several drug-related arrests. On February 27, 1990, the two participated in the arrest of Christine Kleist. Padron, acting undercover, purchased cocaine from Kleist.

Padron testified that when he first spoke with Kleist, he told her that he wanted to purchase cocaine, and she replied that she could get it for him if he followed her to the Douglas Tap. Padron persuaded her to let him wait in the vicinity of 260 Center Street, about 1½ blocks from the Douglas Tap, instead. The police report did not mention the Douglas Tap.

Padron also testified to an undercover operation on February 28, 1990. Working undercover, Officer Padron took a taxicab to the front of the Douglas Tap. He waited there a couple of minutes until Walter Shields exited the tavern, walked up to the cab, and spoke with Padron. After asking what Padron wanted, Shields walked to the "foyer" next to the tavern and motioned Padron to come over. Shields handed Padron a package containing about a quarter gram of cocaine for payment of $25.

Detective Sergeant Brictson arrested Arturo Salez on the evening of April 12, 1990. Brictson was on a stakeout near the Douglas Tap and first saw Salez a few minutes before the arrest. Salez was east of the Douglas Tap and walking west toward it. He went into the Douglas Tap, then came out accompanied by Jerry Rogers. Salez and Rogers engaged in an apparent drug transaction about 50 to 75 feet from the tavern's front door. When Brictson announced his presence, Salez threw away an item that tested positive for cocaine. Brictson acknowledged he did not enter the Douglas Tap that night and that he did not see any crime committed in the immediate area of the Douglas Tap.

Officer Padron and Elgin police officer Don Jerome arrested Lavester Kish on March 6, 1990. Officer Padron testified that on that evening he observed Mark Minter exit the Douglas Tap and run across the street. Next, Lavester Kish ran across the street and stood next to Minter. Officer Padron observed a drug transaction; Officer Jerome, in a squad car, approached the two men. As Jerome exited his vehicle, Kish dropped some packages to the ground. The packages tested positive for cocaine. Officer Jerome testified that, after being

arrested, Kish stated that he had bought the cocaine from someone "from the Douglas Tap."

On March 28, 1990, Officers Padron and Jerome were on a routine bar check inside the Douglas Tap when they arrested Nathan Buckingham. As the officers attempted to enter the washroom, someone inside blocked the door. When the officers forced their way in, they discovered Buckingham and another man facing each other. Buckingham had cocaine in his hand and told the officers that he had obtained it from Kevin Ferguson inside the Douglas Tap. Officers Padron and Jerome stated on cross-examination that they did not observe anything suspicious in the bar area itself that evening. Also, there was a solid wall between the bar and the washroom, and a bartender would not be able to observe the washroom from behind the bar. No agent or employee of the Douglas Tap hindered the officers' arrest.

On April 2, 1990, during a routine bar check, Officers Padron and Jerome arrested Kevin Ferguson and Ronald Mitchell inside the Douglas Tap. As the officers entered the tavern, they observed Ronald Mitchell, who was sitting on a stool at the end of the bar, pick up a small black purse from the bar, dump the contents of the purse onto the floor, and attempt to walk toward the exit. Kevin Ferguson, who was standing next to Mitchell when the officers entered, dropped a plastic baggie onto the ground and attempted to walk away. The contents of the black purse tested positive for cocaine.

Emmett Moneyhun, an Elgin police surveillance officer, testified that on September 2, 1989, he participated in a surveillance that led to the arrest of Jerry Cozart. Stationed in the Kellenberger parking lot, east of and across the street from the Douglas Tap, he focused his attention on the Douglas Tap and the Elgin Inn. Moneyhun observed Cozart making "numerous" drug sales from the area of the front door of the Douglas Tap. According to Moneyhun, Cozart stood at the front door of the Douglas Tap, approached cars as they pulled up there, and proceeded with his transactions. On several occasions, Cozart placed money into his pockets. Moneyhun also saw Cozart "go back to the front door of the Douglas tap [sic], enter the Douglas Tap, come out, wait, go back to different cars, talk to different people." Moneyhun also saw Cozart go to the parking lot east of the Elgin Inn to talk to people in the parking lot there. During about two hours of such activity that evening, Cozart went in and out of the Douglas Tap about four or five times.

Officer Moneyhun and Officer John Demmin arrested Orlando Mavry and Casanova Echols on April 14, 1989. Moneyhun had been

stationed in the parking lot at Kellenberger's for 45 minutes when he observed Mavry, a known drug dealer, going in and out of the Douglas Tap and making sales both on the sidewalk and to passing cars. He and Officer Demmin arrested Mavry and Echols as Mavry was selling cocaine to Echols in the parking lot east of the Elgin Inn. They seized approximately half a gram of cocaine.

Officer Demmin also participated in the arrest of Steven Harper on October 7, 1989, in the parking lot east of the Elgin Inn. Demmin observed Harper walking out of the Douglas Tap toward the parking lot and arrested him on an outstanding traffic warrant. In the course of the arrest, Demmin discovered three grams of cocaine, packaged for sale, on Harper's person.

Over the plaintiffs' objections, the City introduced testimony about the reputation of the Douglas Tap. Detective Sergeant Brictson testified that he was familiar with the general reputation of the Douglas Tap from information he had received over the past two years. Brictson stated that the Douglas Tap had a reputation for general rowdiness and for a high frequency of narcotics trafficking.

Officer Padron testified that he was familiar with the Douglas Tap's reputation from talking to area residents, participating in arrests, talking to other officers, and conducting surveillance. He stated that the Douglas Tap's reputation was "not a good reputation whatsoever. If you need—the way they put it, if you need any drugs, it's just like buying cookies at the store."

Officer Moneyhun testified that 158 North Street has a reputation for curbside drug sales and that the Douglas Tap has a reputation as a large-volume drug center. According to Moneyhun, drug activity in the several-block area was increasing. In the six months before the hearing, there was a large percentage increase in drug sales and activity within the one-block area of the Douglas Tap; this was the result of other places for drug activity, such as the Elgin Inn, being shut down.

Officer Demmin testified that he was familiar with the Douglas Tap's reputation as "a very high drug activity area."

The City also called Warren Danielson. At the time of the hearing, he had been interim Elgin chief of police for slightly less than a year. Danielson stated that he was very familiar with 158 North Street, because of the considerable time and effort that the police department put into handling calls regarding activity there, conducting surveillance, and making arrests. Numerous citizen comments had also familiarized Danielson with the "very negative" reputation of the Douglas Tap, based on the "type of activity" there. The City manager had

complained that it was impossible to drive down North Street at certain hours of the evening because of the heavy traffic and double-parked cars. Further, police manpower, already inadequate to meet community needs, was strained by the need to detail officers to the tavern area because of the drug activity there.

Danielson conceded that most of the objectionable activity was occurring outside the tavern but noted that there was no other commercial or residential property within that block. Danielson also stated that the police had discussed the drug problems with representatives of the Douglas Tap in the previous year, but that the problem had increased, not decreased, since then.

Lee Womack testified both as the City's witness and in the plaintiffs' behalf. He stated that he worked about 45 hours per week at the Douglas Tap, almost entirely in the daytime. In all the time he had worked there, he had not observed any individual using or selling drugs. Womack testified that he had never been accused of involvement in illegal drug activity, nor had his son or anyone who worked at the Douglas Tap ever been arrested for illegal drug activity.

Womack admitted that on April 20, 1990, in connection with his license application, he wrote a letter to Elgin mayor and Commission chairman George Van De Voorde, stating that he was searching for a new location for a tavern in order to "get away from the Elgin Inn," which, before it was closed, was the "center of undesirables dealing in dope and other problems." After the Elgin Inn was closed, the letter went on, some of this activity filtered into the Douglas Tap, and all of Womack's efforts "couldn't stop it 100 per cent."

Womack testified that, in an attempt to stop drug trafficking at the Douglas Tap, about 1½ months before the hearing he had put up a sign on the door, stating that if anyone was caught on the premises with drugs, the tavern management would call the police. Also, after learning of the arrest in the tavern's washroom, he instituted a policy of not letting more than one person occupy the washroom at a time.

The City also introduced into evidence a May 8, 1989, letter from Elgin City Clerk Marie Yearman to Lee Womack. The letter, sent together with an application for a license renewal, stated as follows: "The Liquor Commission is again calling your attention to the number of police calls made to your establishment. Unless immediate steps are taken to eliminate these serious incidents, you will be scheduled for a Hearing before the [Local] Commission."

Asked about this letter on direct examination, Womack stated that he recalled appearing before the Commission approximately a year before the May 1990 hearing. The Commission told him there

had been too many phone calls from the Douglas Tap. Womack testified that he put the Commission's letter to that effect beside the cash register for his employees to see. There had been fewer calls from the Douglas Tap since then.

On cross-examination, Womack testified that after receipt of the Commission's letter, he told his employees to "slow down on calling." He did not, however, tell them to act to "slow down on" the drug incidences.

The Commission received into evidence the plaintiffs' 1990 liquor license applications for the Douglas Tap and two other locations. They list both Lee and Wyndell Womack as applicants for the licenses, with each holding a 50% ownership interest. Both Womacks' signatures appear. The Commission also received the 1989 application for the Douglas Tap, and the 1988 application for the Douglas Tap. Those applications list only Wyndell Womack as the owner. The 1989 application is signed by both Lee and Wyndell Womack as applicants, but the 1988 application is signed only by Wyndell Womack. The 1988 and 1989 applications list Lee Womack as the agent or manager in charge of the premises. Lee Womack admitted at the hearing that he had been a 50% owner of the Douglas Tap since 1982.

Following the hearing, the Commission made written findings that the continued operation of the Douglas Tap constituted a threat to the public health, safety and welfare. It stated its reasons for that finding: (1) the ongoing pattern of drug activity and arrests at and in the immediate vicinity of the Douglas Tap; (2) the increase in such drug-related activity and arrests since the closing of the Elgin Inn; (3) that such drug-related activity was open and notorious; (4) that the plaintiffs had failed to call police or otherwise report such drug activity, but had instead instructed employees not to call the police when illegal activity was observed; (5) that a pattern of drug sales and use had been shown in that persons making curbside and sidewalk drug sales repeatedly enter and exit the Douglas Tap during such transactions; and (6) that known drug dealers were frequent and regular patrons of the Douglas Tap.

The Commission also found that Lee Womack was not of good moral character in that he had listed a false address on his 1990 liquor license applications, had failed to disclose his ownership interest in the Douglas Tap for 1988 and 1989, had falsified his address in his applications for a driver's license and vehicle registration, and had failed to correct any of these false statements. Similarly, it found that the Douglas Tap was not of good reputation in the community, but

rather had the reputation of permitting and facilitating open and notorious drug sales and use.

The Commission's additional findings were (1) that Lee Womack was not a resident of the City of Elgin, and (2) that he had made to the Commission material misrepresentations about his address and ownership in the tavern. The Commission stated that its findings "jointly and severally" constituted sufficient ground for nonrenewal of the tavern's license. It denied the renewal application.

The plaintiffs appealed to the State Commission, which affirmed the Commission and denied the plaintiffs' motion for a rehearing. The plaintiffs then sought administrative review in the circuit court of Kane County. The circuit court affirmed the State Commission, but granted the plaintiffs a stay. The plaintiffs now appeal.

On appeal, the plaintiffs first challenge the sufficiency of the evidence for the Commission's decision not to renew their license for the Douglas Tap. They argue as follows: (1) that the Commission improperly punished the plaintiffs for illegal drug activity which occurred on public property and over which the plaintiffs had no control; (2) that the Commission improperly considered evidence of the reputation of the business instead of evidence of the licensee's reputation (see Ill. Rev. Stat. 1989, ch. 43, par. 120(2)); (3) that the Commission erred in finding that Lee Womack was not a resident of Elgin; and (4) that the Commission should not have considered Lee Womack's illegal failure to disclose his 50% ownership interest in the Douglas Tap on two previous applications (see Ill. Rev. Stat. 1989, ch. 43, par. 145(24)) because this ground for license denial was not disclosed in the amended notice of hearing.

In their initial argument that there is not sufficient evidence to support the Commission's findings, the plaintiffs contend that the Commission could not properly refuse to renew their license for the tavern because of conduct and circumstances over which they had no real control, *i.e.*, the drug activity occurring on the public streets and areas in the vicinity of the plaintiffs' establishment. The plaintiffs argue that the evidence completely fails to show that they or any employee or agent of the Douglas Tap in any way contributed to or condoned this illegal activity. The plaintiffs maintain that they are being punished for the City's inability to control drug trafficking on public property.

On circuit court or appellate review, a local liquor control commissioner's decision to deny renewal of a liquor license is analyzed the same as a local commission's decision to revoke a license. (See *Latin Social Club, Inc. v. Illinois Liquor Control Comm'n* (1977), 54 Ill.

App. 3d 798, 799, 805.) The Liquor Control Act of 1934 (the Act) (Ill. Rev. Stat. 1989, ch. 43, par. 93.9 *et seq.*) does not define "cause" to revoke a liquor license (*Askew v. Daley* (1978), 62 Ill. App. 3d 370, 373); however, local liquor commissioners have considerable discretion to revoke a license, if good cause is shown (*Leong v. Village of Schaumburg* (1990), 194 Ill. App. 3d 60, 65). On review, a local commission decision to revoke may not be disturbed for lack of evidence if there is any record evidence to support it. *Leong*, 194 Ill. App. 3d at 65.

In furtherance of the Act's objectives, State regulations provide that "No person holding a license *** shall in the conduct of the licensed business or upon the licensed premises *** [s]uffer or permit a violation of any law of the State of Illinois, or of any rule of this Commission." (Emphasis added.) (11 Ill. Adm. Code §100.30(a)(3) (1991).) The mental state "suffer or permit" can be interpreted to require proof of authorization, knowledge or, at least, recklessness in failing to know. *Hansmar, Inc. v. Illinois Liquor Control Comm'n* (1979), 78 Ill. App. 3d 690, 694.

■ In this case, the Commission considered substantial evidence of illegal drug activity inside and in close physical connection with the tavern. There also was substantial evidence of the plaintiffs' and their employees' knowledge of the existence of this activity. There was not only testimony of tavern representatives' presence when such activity occurred. There also was testimony that after the City informed the plaintiffs that the number of police calls from the tavern must be decreased, Lee Womack informed tavern employees to call the police less frequently. That instruction apparently was without regard for the likelihood of a diminished level of illegal activity.

The Commission failed to make an explicit finding that the plaintiffs had "suffered or permitted" State law violations, in violation of liquor license regulations. Nevertheless, in light of Lee Womack's police call instruction to employees, plus his general acknowledgment of tavern-related illegal drug activity and the extensive evidence of such activity, we find that the evidence manifestly supports such a conclusion. See *Jager v. Illinois Liquor Control Comm'n* (1979), 74 Ill. App. 3d 33, 41.

Because of the close connection between a liquor licensee's violation of regulations against "suffering or permitting" illegal drug activity and the governmental interest in protecting the public health, safety, and welfare (compare *Askew v. Daley* (1978), 62 Ill. App. 3d 370, 374), and although a licensee generally cannot be held responsible for conduct over which he had no control (*Jager*, 74 Ill. App. 3d at

40), we find no insufficiency of evidence to support the Commission's finding of cause to revoke (*Leong v. Village of Schaumburg* (1990), 194 Ill. App. 3d 60, 64-65). Furthermore, because the record on this single aspect was sufficient to support the Commission's decision, we find no need to address the plaintiffs' challenges to the factual sufficiency of the Commission's other reasons for finding that the tavern constituted a threat to the public health, safety, and welfare. (*Leong*, 194 Ill. App. 3d at 65.) The plaintiffs do not argue, and the record does not demonstrate, that any of the Commission's other challenged findings biased this proper finding and the Commission's action thereupon.

■ We proceed, then, to the plaintiffs' argument that even if the decision of the Commission was not insufficiently supported by the evidence, the Commission's imposition of the harsh penalty of denial of a petition to renew was an abuse of discretion. We find no such abuse.

In this portion of their argument, the plaintiffs cite cases where reviewing courts found that although the evidence supported liquor commission fact findings, the sanction of license revocation was an abuse of discretion. The plaintiffs also analogize, in part, our recent decision in *Hanson v. Illinois Liquor Control Comm'n* (1990), 201 Ill. App. 3d 974. There, we held that revocation of the plaintiffs' liquor license was an excessively severe penalty for a single sale of cocaine by the plaintiffs' employee. *Hanson*, 201 Ill. App. 3d at 983-84.

We find that *Hanson*, and the plaintiffs' other cases, are distinguishable. Here, we have not just evidence of an isolated incident supporting the Commission's decision. Rather, there is evidence of a long-standing and significant pattern of illegal drug activity to support the Commission's finding that the plaintiffs' licensed operation of the tavern posed a threat to the community. Although the evidence does not show that the plaintiffs willingly aided this activity, and although Lee Womack has held a liquor license since 1982, given the extent of evidence to support a finding that the tavern facilitated drug trafficking, we find "good cause" for not renewing the plaintiffs' license and no abuse of discretion.

Based upon the foregoing, we affirm the judgment of the circuit court of Kane County.

Affirmed.

UNVERZAGT and BOWMAN, JJ., concur.