JACQUELYN'S LOUNGE, INC., d/b/a City Limits, *et al.*, Plaintiffs-Appellants, v. LICENSE APPEAL COMMISSION OF THE CITY OF CHICAGO *et al.*, Defendants-Appellees.

First District (6th Division) No. 1—94—1689

Opinion filed January 26, 1996.

Robert J. Weber and Anne T. Bottini, both of Chicago, for appellants.

Susan S. Sher, Corporation Counsel, of Chicago (Lawrence Rosenthal and Meera Werth, Assistant Corporation Counsel, of counsel), for appellees.

JUSTICE McNAMARA delivered the opinion of the court:

This matter involves an administrative review action wherein the trial court affirmed the decision of defendant License Appeal Commission of the City of Chicago (LAC) to revoke all City of Chicago (City) licenses, including one for liquor, which had been issued to plaintiff Jacquelyn's Lounge, Inc. (licensee). The lounge, which had been doing business as City Limits, was located at 4086 North Broadway in Chicago and was owned by plaintiff Nick Georgelos. Defendants William D. O'Donaghue, Albert D. McCoy and Irving J. Koppel are duly appointed members of the LAC. The licenses were revoked based on the testimony of a Chicago police officer regarding the sale of narcotics by a bartender/waitress in the lounge between April 6 and April 13, 1993. It is undisputed that the licensee did not know about, profit from or facilitate this illegal activity. The pertinent facts are as follows.

On April 23, 1993, defendant Richard M. Daley, mayor and liquor control commissioner of the City of Chicago, through the director of the Local Liquor Control Commission (LLCC), issued a license order or a summary order pursuant to section 7—5 of the Liquor Control Act of 1934 (235 ILCS 5/7—5 (West 1992)), summarily closing the licensed premises from April 23, 1993, to April 30, 1993, because of evidence showing that its employee, Michelle McClinton, a bartender/waitress, was selling cocaine in the lounge.

The LLCC director believed that the continued operation of the lounge constituted an immediate threat to the community. The order also set a date for a revocation hearing on April 29, 1993, on five charges which grew out of the purchase of 0.50 grams of cocaine on the licensed premises on April 9, 1993.

The summary order alleged that the licensee through its agent,

McClinton, "knowingly permitted or made available the premises building for use in the manufacture or delivery of *** cocaine in violation of *** the Illinois Revised Statues," "encouraged or permitted on the licensed premises, the sale of *** [c]ocaine, in violation of [the] Illinois Revised Statutes, *** contrary to *** the Municipal Code of Chicago, (as amended)," and "suffered or permitted the delivery of *** [c]ocaine on the licensed premises in violation of *** [the] Illinois Revised Statutes contrary to *** the Rules and Regulations of the Illinois Liquor Control Commission." The summary closing further advised that "for the limited purpose of assessing the severity of the penalty that could be imposed, when applicable, the City may present evidence of previous acts of misconduct which have resulted in disciplinary action against the licensee, along with any other *** complaints."

On April 29, 1993, an evidentiary hearing was held on the substantive charges before the LLCC's deputy commissioner, who performed the role of a hearing officer. During the hearing, witnesses for the City and the lounge testified about the events leading up to the closing of the lounge and the revocation of its liquor license. During the City's rebuttal argument before the LLCC, the assistant corporation counsel stated, "we are not alleging that the owner did anything personally. What we're alleging is the agent, Michelle McClinton, who's named in the notice of hearing, knowingly allowed unlawful activity to occur on the licensed premises ***." The testimony elicited at the hearing revealed the following.

Officer Joseph Airhart, a Chicago police officer, who was assigned to the narcotics division, testified for the City that on April 6, 1993, he visited the lounge in an undercover status. On that date, he approached the bar and spoke to McClinton, the bartender, whom he had previously seen at the lounge. When McClinton asked him where he had been, Airhart responded that he had been incarcerated for several months for the possession of narcotics. McClinton told Airhart that if he returned to the lounge the following night, she would be able to give him some cocaine.

Still undercover, Airhart returned to the lounge the following evening, April 7, and saw McClinton sitting at the bar. Airhart took a seat at the bar. After he had been in the lounge for about an hour, Airhart had a conversation with McClinton. Other patrons of the bar were nearby. During that conversation, which McClinton initiated, she informed him "that the coke was in the bar." She then asked him if he wanted any. Airhart indicated that he always wanted coke, but that he was short of money. McClinton informed Airhart that they needed to talk business and indicated that he should sit at a

table which was about 6 to 10 feet from the bar. The table was not obstructed in any way from the bar area, and the area was well illuminated. There were about three other employees working that night and a minimum of 10 patrons. No one else was sitting at the tables. When they were seated at the table, McClinton informed Airhart that she could get him coke. She also told him that she was trustworthy. She works in the bar, and people have access to her. Airhart described part of that conversation with McClinton as follows:

> "She then informs me that she's the connection. She's tapped into the source of narcotics, cocaine, and that she can get me cocaine, rock cocaine, or weed, which is slang for marijuana, and that the purity is excellent, that the packages would be fat at prices I could afford."

Airhart then informed McClinton that he wanted to buy two quarter grams of cocaine for $20 apiece. They arranged for the sale to take place the following day, April 8, in the lounge.

Airhart returned to the lounge the following evening at about 9 or 10 p.m., again undercover. He noticed that McClinton was not there. Airhart was informed that McClinton would be returning. He waited two hours, but she did not show up.

Airhart returned to the lounge on Friday, April 9, at 9 or 10 p.m., again undercover. He met McClinton outside, just as he was entering the lounge. She told him that she had been informed that Airhart had been there and waited for her for two hours. McClinton said that she had just missed him. She also said that she was working as a cocktail waitress that night. Once they were in the lounge, she asked if Airhart still wanted coke, and he said that he did. She then told him to go to the bar, order a drink and sit at the side table, which Airhart proceeded to do. The table was about 6 to 10 feet from the bar. There was a minimum of eight people sitting at the surrounding tables, with the closest person being about less than six feet away. The area was well illuminated. Airhart saw three or possibly four other employees there that night. Airhart observed McClinton talking to a man who was standing at the bar. He saw the man, who was later identified as Irving Mayfield, hand her two white packets. Airhart was 10 to 12 feet away from them. McClinton returned to the table and asked him for $40 in exchange for the coke. Airhart handed her two $20 bills. The serial numbers of those bills had been previously recorded. McClinton then handed the two white packets to Airhart. Airhart did not observe anyone listening in on their conversation. The packets were later found to contain cocaine.

Before leaving the lounge about 20 minutes later, he saw McClin-

ton serving drinks to patrons. McClinton was the only cocktail waitress working that night. Airhart also observed two or three people approach Mayfield while he was standing at the bar, hand him what appeared to be money and receive from him white packets, similar to the ones Airhart had received from McClinton. Afterwards, he observed McClinton conversing with Mayfield.

Airhart returned to the lounge on April 13, 1993. He observed McClinton and Mayfield sitting at the bar. Airhart proceeded to have a conversation with McClinton near the bar counter. Mayfield, the bartender, and the bouncer were nearby, as were patrons of the lounge, the closest being less than three feet away. McClinton said she still worked at the lounge, but only as a cocktail waitress, not as a bartender anymore. She was not working that evening. McClinton asked Airhart if he wanted to "cop some coke." Airhart replied that he did and again handed her two $20 bills, whose serial numbers had previously been recorded. McClinton told him to go to the north set of tables. They sat at those tables, whereupon McClinton handed him two white packets. Those packets were later found to contain cocaine. Before Airhart left the lounge, he had a conversation with McClinton during which other bar patrons were nearby, the closest being less than three feet away. McClinton told him that if he wanted to get more coke, he would have to come back by midnight. After leaving the premises, Airhart radioed his supervisor and told him what had occurred in the lounge. Airhart gave him the physical descriptions of both McClinton and Mayfield. Shortly thereafter, Airhart observed the organized crime narcotic units enter the lounge, along with uniformed police. After Airhart identified McClinton and Mayfield, they were arrested.

Nick Georgelos, the owner of the lounge, testified that he had operated the licensed premises for $8^{1}/_{2}$ years and employed six people there. He knew McClinton for approximately three years. She was employed at the lounge between 14 and 16 hours per week. McClinton had worked as a bartender at the lounge on Tuesday nights and on an occasional Sunday; however, on Tuesday, April 13, she did not tend bar because on the preceding Tuesday, $20 was found missing from the register. She was demoted to waitress as the result of the theft.

According to Georgelos, McClinton did not work on April 7, 8 or 13. She was, however, on duty on April 9 and worked as a waitress. After her arrest, Georgelos dismissed her. Georgelos testified that Mayfield, a neighbor, had never been an employee of the lounge. He did not know that McClinton or Mayfield was selling cocaine or was in possession of same on the premises. The lounge had a policy that

any employee suspected of selling narcotics would be fired immediately and would not be allowed to enter the lounge for any reason, while customers suspected of the same would also be barred from the lounge.

Alex Richardson testified for the lounge that he was employed by Georgelos in a security capacity and as a bartender at the lounge. He was in charge of the premises when an officer of the corporation was not present. On Friday and Saturday nights, Richardson collected a cover charge at the door, which was used as a deterrent to keep characters out. On those nights, two other employees worked security with him. The lounge had a dress code, which it enforced in an effort to keep out people who just wanted to hang out there. The lounge had occasion in the past to call the police for assistance with regard to matters inside the lounge, which had a seating capacity of 100 people. The lounge had a policy of not allowing the possession and sale of cocaine on the premises and had occasion in the past to refuse admission to the lounge to individuals thought to be involved with controlled substances. Richardson was working at the lounge on April 6, 7, 8, 9 and 13, 1993. McClinton worked as a bartender on the evening of April 6. She did not work on April 13, however, because she was demoted to waitress. He stated that he knew Mayfield, who was one of the lounge's patrons until he was apprehended for possession of narcotics. Richardson did not know that McClinton or Mayfield was in possession of cocaine or that they were selling cocaine on the premises.

It is undisputed that neither the lounge nor Georgelos had any prior violations. Over plaintiffs' objection, the hearing officer allowed a document entitled "order of disposition," which was entered on July 25, 1986, to be admitted into evidence as the City's exhibit 8. The order of disposition states that a warning was issued to plaintiffs by the office of the mayor on account of a simple battery that occurred on May 9, 1986, on the licensed premises. The order of disposition does not state the basis for the LLCC director's actions or describe plaintiffs' involvement in the incident. Georgelos testified that no employees of the licensee or of his company were involved in the battery. (The City apparently agrees that the evidence of the warning should not have been admitted into evidence, but asserts that the LLCC did not give any weight to the warning in fashioning the order of revocation.)

The recommendations of the hearing officer were not made a part of the record. The licensed premises were allowed to open on April 30, 1993.

After the evidentiary hearing, the LLCC entered an order on

June 22, 1993, revoking the lounge's City of Chicago retail liquor license and all other City licenses, effective July 2, 1993, based on the findings that McClinton, an employee and agent of the lounge, used the premises to sell cocaine, which was supplied to her by Mayfield, in a manner visible to others, including Airhart, during the period of April 6 through and including April 13, 1993, "constitut[ing] such a serious threat to the Public Health and Welfare as to justify revocation of the license." It also found that Mayfield's acts would give a reasonable person reason to believe that sales of controlled substances were occurring without threat of reprisal.

On June 23, 1993, the lounge appealed the LLCC's order of revocation to the LAC, which heard oral arguments on October 13, 1993. On October 26, 1993, the LAC, acting pursuant to section 7—9 of the Act (235 ILCS 5/7—9 (West 1992)), entered its findings, after reviewing the record, and affirmed the order of revocation. On November 12, the LAC denied plaintiffs' application for rehearing.

On November 19, 1993, plaintiffs filed a complaint in the circuit court of Cook County for administrative review of the LAC's decision. On December 9, 1993, the trial court denied plaintiffs' motion for a stay, and licensee was required to close the lounge as of that date. On May 3, 1994, the trial court, after having reviewed the relevant pleading and having heard oral arguments from both parties, affirmed the LAC's order. The court found that there was a sufficient basis for the mayor to utilize the summary closing provision of the Liquor Control Act of 1934 in this case. This appeal follows.

On appeal, plaintiffs contend that the trial court erred in affirming the LAC's decision to revoke all City licenses issued to plaintiffs, where: (1) the LLCC misconstrued and misapplied the summary closing statute, depriving licensee of due process, where the City allegedly failed to prove, at the hearing required within seven days after the summary closing, that continued operation of the licensed premises would immediately threaten the community; (2) the LLCC committed prejudicial error when it allowed into evidence, as aggravation, a prior warning issued to the lounge, where a warning is not a disciplinary action for purposes of aggravation; (3) they were denied due process when they were not provided with a trial *de novo* before the LAC; and (4) under the facts of this case, revocation of their licenses was an abuse of discretion.

We deem it unnecessary to consider plaintiffs' arguments that the City's construction of the summary closing statute violated due process, that improper and prejudicial evidence was admitted at the hearing, and that they were entitled to a *de novo* hearing before the LAC. We also find that the evidence was sufficient to support the imposition of a penalty.

We thus turn to plaintiffs' contention that under the circumstances of this case, the revocation of their liquor license by the City was an abuse of discretion. Plaintiffs argue that, assuming the City proved a violation chargeable to the licensee, the penalty should have been a fine, at worst, since this was the first time that the licensee and/or Georgelos had been charged with any wrongdoing during the 8¹/₂ years that they have had licenses to sell liquor and the 9¹/₂ years that Georgelos had a food dispenser's license. In addition to the fact that neither Georgelos nor the licensee had ever been charged with any violations of the liquor laws, plaintiffs point out that it is undisputed that Georgelos did not have prior personal knowledge of or involvement with the sale of narcotics in the lounge.

■ It is well established that the violation of any statute, ordinance, or regulation related fairly to the control of liquor, upon liquor-licensed premises, generally constitutes cause for revocation of a license. (*Hanson v. Illinois Liquor Control Comm'n* (1990), 201 Ill. App. 3d 974, 983, 559 N.E.2d 1092, 1097, citing *Leong v. Village of Schaumburg* (1990), 194 Ill. App. 3d 60, 550 N.E.2d 1073, and *Lopez v. Illinois Liquor Control Comm'n* (1983), 120 Ill. App. 3d 756, 458 N.E.2d 599.) A reviewing court, however, may overturn sanctions imposed by an agency that have been determined to be overly harsh in view of mitigating circumstances. (*Feliciano v. Illinois Racing Board* (1982), 110 Ill. App. 3d 997, 443 N.E.2d 261.) The issue is not whether the reviewing court would decide upon a more lenient penalty were it initially to determine the appropriate discipline, but rather, in view of the circumstances, whether this court can say that the commission, in opting for a particular penalty, acted unreasonably or arbitrarily or selected a type of discipline unrelated to the needs of the commission or statute. *Feliciano v. Illinois Racing Board*, 110 Ill. App. 3d at 1005, 443 N.E.2d at 267, citing *Sutton v. Civil Service Comm'n* (1982), 91 Ill. 2d 404, 438 N.E.2d 147.

In *Hanson v. Illinois Liquor Control Comm'n* and *Byrne v. Stern* (1981), 103 Ill. App. 3d 601, 431 N.E.2d 1073, revocation was found to be an abuse of discretion based on the fact that the parties had operated their liquor businesses for 33 and 5¹/₂ years, respectively, without a previous license violation. The *Hanson* court also based its decision on the fact that there was no evidence that the plaintiffs were aware of or condoned the sale of cocaine at their bar, while the *Byrne* court noted that there was no evidence that the licensee had prior personal knowledge of the violation by his employee.

■ While we hold that the commission's findings were not against the manifest weight of the evidence, we find that under the circumstances of this case the penalty of revocation was unduly harsh. (*Sol-*

*dano v. Illinois Liquor Control Comm'n* (1985), 131 Ill. App. 3d 10, 475 N.E.2d 560.) The record reveals that Georgelos had held a liquor license for more than eight years and a food dispenser's license for more than nine years at the time of the subject sale of cocaine, without ever having been previously charged with license violations. It further shows that the City presented no evidence to refute these facts. (*Soldano v. Illinois Liquor Control Comm'n*, 131 Ill. App. 3d 10, 475 N.E.2d 560.) Furthermore, we find that there is an absence of evidence in the record showing that plaintiffs had prior personal knowledge or involvement with the sale of cocaine on the licensed premises in violation of the liquor control laws. Moreover, there is no evidence of any history of significant drug activity on the licensed premises. (See *Womack v. Local Liquor Control Comm'n* (1992), 229 Ill. App. 3d 402, 593 N.E.2d 1102.) In light of the above legal principles and the mitigating circumstances found here, we find that the defendants' imposition of revocation as a penalty was an abuse of discretion. We are unpersuaded by the City's argument that *Hanson v. Illinois Liquor Control Comm'n*, 201 Ill. App. 3d 974, 559 N.E.2d 1092, and *Byrne v. Stern*, 103 Ill. App. 3d 601, 431 N.E.2d 1073, are not in line with the majority of this court's decisions. We are further unpersuaded by the cases cited by the City to support its position that the imposition of penalties should not be reviewed. In *Daley v. Jack's Tivoli Liquor Lounge, Inc.* (1969), 118 Ill. App. 2d 264, 254 N.E.2d 814, the question of whether revocation was an abuse of discretion was not at issue, while in *Spiros Lounge, Inc. v. Illinois Liquor Control Comm'n* (1981), 98 Ill. App. 3d 280, 423 N.E.2d 1366, this court reviewed the penalty and found a rational basis for it.

According to the record, the lounge here has been closed since December 9, 1993. We believe that under these facts and circumstances, that penalty is sufficient punishment.

For the reasons stated, the judgment of the circuit court of Cook County is affirmed in part and reversed in part.

Judgment affirmed in part; reversed in part.

ZWICK, P.J., and RAKOWSKI, J., concur.