# Illinois Official Reports

## Appellate Court

---

**King's Health Spa, Inc. v. Village of Downers Grove, 2014 IL App (2d) 130825**

---

| | |
|---|---|
| Appellate Court Caption | KING'S HEALTH SPA, INC., Plaintiff-Appellant, v. THE VILLAGE OF DOWNERS GROVE, Defendant-Appellee (David B. Fieldman, Massage Business Commissioner of the Village of Downers Grove, Defendant).–ACE SPA, INC., Plaintiff-Appellee, v. THE VILLAGE OF DOWNERS GROVE, Defendant-Appellant (David B. Fieldman, Massage Business Commissioner of the Village of Downers Grove, Defendant). |
| District & No. | Second District<br>Docket Nos. 2-13-0825, 2-13-0978 cons. |
| Filed<br>Rehearing denied | June 11, 2014<br>June 27, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The revocation of plaintiffs' massage establishment licenses by defendant village's massage business commissioner was not an abuse of discretion in view of the evidence that employees of the businesses engaged in acts of prostitution. |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, Nos. 11-MR-1734, 11-MR-1477; the Hon. Robert G. Gibson and the Hon. Terence M. Sheen, Judge, presiding. |
| Judgment | No. 2-13-0825, Affirmed.<br>No. 2-13-0978, Reversed; judgment entered. |

Counsel on
Appeal

J. Mark Lukanich, of Law Offices of J. Mark Lukanich, of Palos Heights, for King's Health Spa, Inc.

John B. Murphey and Matthew D. Rose, both of Rosenthal, Murphey, Coblentz & Donahue, of Chicago, and Enza I. Petrarca, Assistant Village Attorney, of Downers Grove, for Village of Downers Grove.

H. Shawn Kim, of Chicago, for Ace Spa, Inc.

Panel

JUSTICE ZENOFF delivered the judgment of the court, with opinion. Justices Jorgensen and Birkett concurred in the judgment and opinion.

## OPINION

¶ 1    In these consolidated appeals, plaintiffs, King's Health Spa, Inc. (King's), and Ace Spa, Inc. (Ace), owners of massage establishments, filed petitions for writs of *certiorari* seeking review of decisions by the massage business commissioner (Commissioner) of the Village of Downers Grove (Village) revoking plaintiffs' massage establishment licenses. The Commissioner revoked the licenses pursuant to section 8.2016(a)(3) of the Village's massage business ordinance (Downers Grove Municipal Code § 8.2016(a)(3) (amended Jan. 18, 2005)), which provides that a massage establishment license is subject to suspension or revocation if "any massage therapist practicing at the licensed premises has committed a *** Specified Criminal Act *** on the Licensed Premises." The ordinance defines "Specified Criminal Act" to include an act of prostitution.

¶ 2    In the King's matter, the trial court denied the petition for writ of *certiorari*, and King's appeals (No. 2-13-0825). In the Ace matter, the trial court granted the petition for writ of *certiorari* and, following two remands to the Commissioner, ultimately ruled that the 72 days during which Ace's license was revoked was a sufficient sanction for its ordinance violation;[1] in that matter, the Village appeals (No. 2-13-0978). We hold that the Commissioner did not abuse his discretion in revoking either King's or Ace's massage establishment license.

---

[1]Although the matter has been pending for more than 2 years, the Commissioner's revocation of Ace's license was stayed for all but 72 days of that time.

## I. BACKGROUND

### A. The King's Case (No. 2-13-0825)

On June 6, 2011, the Commissioner filed a notice of charges and hearing against King's, alleging that, on March 31, 2011, one of King's employees committed an act of prostitution at the spa and that, pursuant to ordinance section 8.2016(a)(3), King's license could be suspended or revoked. A hearing before the Commissioner's designated hearing officer took place on October 20, 2011.

At the hearing, Sergeant Steve Loan of the Illinois State Police Public Integrity Task Force testified that he had been involved in 10 to 12 investigations of prostitution operations. On March 31, 2011, Sergeant Loan participated in an undercover investigation of King's. The sergeant testified that he drove to King's in an undercover vehicle and entered the spa at approximately 3:45 p.m. He testified that he asked a woman at the front desk for an appointment and that she led him to a room, where he was left alone. The sergeant testified that a different woman entered the room and told him that a massage would cost $70. He paid the woman, who left the room. Sergeant Loan testified that he undressed, lay on the massage table, and covered himself with a towel. The woman returned and began the massage.

According to Sergeant Loan, the woman asked him his age and whether he was a police officer. Sergeant Loan told her that he was 41 years old and in the Navy. The sergeant testified that, based on his experience investigating prostitution, he knew that offenders believed that police officers were duty-bound to disclose their occupation. Sergeant Loan testified that the woman said that she did not believe that he was 41 years old and asked to see his driver's license. The sergeant believed that this was a ruse to see if he had a police badge. He testified that he retrieved his wallet and license, showed the license to the woman, and returned to the table. According to the sergeant, when he returned to the table, the woman slapped his buttocks and said that he was a "bad boy." The sergeant testified that she then began singing the theme song from the television show "Cops." Sergeant Loan testified that, when he lay back down on the table, the woman pinched his nipple and again called him a "bad boy." The sergeant further testified that the woman asked if he wanted to take a shower and that he declined. According to Sergeant Loan, prostitution offenders in massage spas often attempt to separate customers from their belongings so that other employees can search for any indication that a customer is a police officer.

Sergeant Loan testified that the woman next asked him what kind of vehicle he drove and where in the parking lot the vehicle was located. The sergeant told her that he drove a Nissan that was parked on the side of the building. He testified that the woman excused herself from the room for approximately five minutes. The sergeant explained that he believed that the woman left to investigate his car for signs that he was a police officer. He testified that when the woman returned she crouched down so that her head was at his eye level. According to the sergeant, she then put one finger to her lips, said "shush," and made a licking motion. The sergeant believed that this was an offer to perform oral sex. Sergeant Loan testified that the woman pointed at him and that he said "yes." According to Sergeant Loan, the woman removed the towel so that he was naked. The sergeant told the woman that he had to go to the bathroom. After he exited the room, fellow officers entered King's and arrested the woman.

¶ 9    Lieutenant William Budds of the Village police department testified that, on March 31, 2011, he was parked approximately 150 feet east of King's, monitoring the premises. According to Lieutenant Budds, while Sergeant Loan was inside King's, he (Budds) observed a woman exit the side door of the business, look to the left and right, then reenter the business. Lieutenant Budds testified that, a few minutes later, he observed the woman exit the same door, walk north to the fence line of the property where vehicles were parked, then reenter the business. According to the lieutenant, shortly thereafter another woman exited the business, walked east toward Sergeant Loan's undercover Nissan, walked around the vehicle, looked into the vehicle, then reentered King's. Lieutenant Budds was not sure if the woman who looked into the Nissan was the same woman who had previously exited the business.

¶ 10    King's presented no mitigation evidence at the hearing and did not file a written closing argument, despite the hearing officer's request. On November 15, 2011, the Commissioner revoked King's massage establishment license. The Commissioner found that evidence at the hearing established that King's violated ordinance section 8.2016(a)(3).

¶ 11    King's filed a petition for writ of *certiorari* in the trial court. King's alleged that the Commissioner's finding of a violation of ordinance section 8.2016(a)(3) was against the manifest weight of the evidence and that the Commissioner's decision to revoke its massage establishment license was an abuse of discretion.

¶ 12    On July 11, 2013, the trial court denied King's petition for writ of *certiorari*. The court reasoned that the Commissioner's finding that King's violated ordinance section 8.2016(a)(3) was not against the manifest weight of the evidence. The court further determined that, given King's failure to present mitigation evidence at the hearing, and given that the Village's evidence suggested a "scheme endemic to the business, as opposed to the isolated act of an individual," the Commissioner did not abuse his discretion in revoking the license. King's timely appeals.

¶ 13                    B. The Ace Case (No. 2-13-0978)

¶ 14    On June 6, 2011, the Commissioner filed a notice of charges and hearing against Ace, alleging that on March 31, 2011, one of Ace's employees committed an act of prostitution at the spa and that, pursuant to ordinance section 8.2016(a)(3), Ace's license could be suspended or revoked. A hearing before the Commissioner's designated hearing officer took place on September 7, 2011.

¶ 15    At the commencement of the hearing, the Village moved for a "summary determination" and directed finding as to the Commissioner's charge. The Village supported its motion with a copy of a jury's verdict finding Ace's employee guilty of prostitution. The Village also introduced the police report arising out of the employee's arrest. The report indicated that an undercover officer entered the spa and paid $70 for a massage. The woman giving the massage asked the officer his occupation, and the officer told her that he worked in the construction business. The woman asked the officer what he "wanted her to rub." The employee then attempted to touch the officer's penis. The officer stopped the woman, and the woman asked him if he wanted to shower. According to the report, the woman again attempted to touch the

- 4 -

officer's penis while he was in the shower. Fellow officers entered Ace and arrested the woman. The hearing officer granted the Village's motion and found that Ace violated the ordinance.

¶ 16     The hearing officer allowed Ace to submit evidence in mitigation. Chong Kim testified that he was Ace's sole owner and that he purchased the business in 1999 for $45,000. According to Kim, he invested an additional $40,000 to renovate the business. Kim testified that he recently signed a 3-year lease and paid $3,000 per month in rent. Kim admitted that it was a risk to renew his lease, given that he could lose his massage establishment license. According to Kim, the spa's monthly gross income averaged $12,000, while net income averaged $2,000.

¶ 17     Kim, who was 47 years old, testified that he was in ill health and could not work full-time. Kim explained that he relied on a manager, who had worked for him for nine years, to run the business. According to Kim, he instructed his manager to inform him of any improper or illegal activities at the business. Kim testified that, from 1999 to the date of the prostitution incident in March 2011, he never received any tickets or citations from the Village and never became aware of any illegal activity on the premises. The employee who was arrested for prostitution worked for Ace for one year. Kim testified that he fired the employee shortly after learning that she was convicted of prostitution. According to Kim, he had no idea that the employee was inclined to engage in illegal activities. When asked what criteria he used in deciding whether to hire an employee, Kim testified that his policy was "no tolerance for any illegal activity." However, Kim explained that the manager made hiring decisions. According to Kim, in order to prevent similar incidents in the future, he planned to have new employees sign written agreements. Kim further testified that he visited the business once per month to receive a report from the manager and to pay bills. Kim admitted that he was familiar with the Village's ordinances and knew that he could lose his license if one of his employees engaged in prostitution.

¶ 18     The hearing officer issued a written recommendation that the Commissioner revoke Ace's massage establishment license. The hearing officer gave little weight to Kim's mitigation evidence that he was in ill health, had invested money in the business, and recently renewed his lease. The hearing officer further found that Kim's policy regarding illegal activity "fail[ed] to address the seriousness" of the prostitution incident at the spa. On October 3, 2011, the Commissioner adopted the hearing officer's findings and recommendation and revoked Ace's massage establishment license.

¶ 19     Ace filed a petition for writ of *certiorari* in the trial court. Ace alleged that section 8.2016(a)(3) of the Village's massage business ordinance violated the due process clause of the fourteenth amendment, because it eliminated any requirement of knowledge on the part of the licensee that its employee was engaged in illegal activity. Ace alternatively alleged that the Commissioner's decision to revoke Ace's massage establishment license was an abuse of discretion.

¶ 20     On December 14, 2011, the trial court granted Ace's petition for writ of *certiorari*, vacated the Commissioner's decision revoking Ace's license, and remanded to the Commissioner to hear additional evidence in mitigation or aggravation and impose a new sanction. The court agreed with Ace that revocation was an abuse of discretion in light of the evidence at the

hearing. The Village appealed, but this court dismissed the appeal for lack of jurisdiction, because the order remanding to the Commissioner was not a final and appealable order. *Ace Spa, Inc. v. Village of Downers Grove*, 2012 IL App (2d) 120017-U (summary order).

¶ 21 On remand, a hearing before the Commissioner's designated hearing officer took place on September 27, 2012. The Village presented the only witness, United States Department of Homeland Security Special Agent Ben Bauman. The Village prefaced Agent Bauman's testimony by saying that it would not concern "anything about Ace Spa in particular" but would concern the "problems endemic to what are commonly referred to as *** Asian massage parlors, or *** Korean massage parlors." Ace's attorney objected on relevance grounds, but the hearing officer permitted the testimony subject to Ace's continuing objection.

¶ 22 Agent Bauman testified that his investigations focused on human trafficking and smuggling of persons from Asian countries. Agent Bauman testified that he had investigated 20 to 30 massage parlors in which prostitution was suspected. According to the agent, the massage parlors often operated out of low-rent storefronts and were thinly veiled prostitution operations. He testified that the massage parlor owners would fund the cost of transporting women to the United States. According to Agent Bauman, this often involved violations of immigration laws. The women would then be forced to work in the parlors, performing prostitution, in order to pay their debts to the owners.

¶ 23 On cross-examination, Agent Bauman admitted that other types of businesses, including nail salons and restaurants, were involved in human trafficking and prostitution. He further admitted that the problems of human trafficking and prostitution were not limited to persons from Asian countries. Agent Bauman acknowledged that his 20 to 30 investigations of massage parlors took place over a five-year period and were spread across a number of cities and counties in the Chicago area. Agent Bauman testified that he was not aware of any investigations into Ace's spa other than the Village's pending license revocation proceeding. Although Agent Bauman had conducted investigations in Du Page County, he had not performed any investigations in the Village.

¶ 24 The hearing officer again recommended revoking Ace's license, and the Commissioner adopted the recommendation. In a written order, the Commissioner reasoned that Agent Bauman's testimony "demonstrate[d] why revocation [wa]s an appropriate sanction." According to the Commissioner, the agent "described in detail that massage parlors such as Ace, which operate out of storefronts, are frequently fronts for sophisticated prostitution operations." The Commissioner further reasoned that the crime of prostitution in massage parlors is very difficult to detect, that the Village's ordinance gave notice that a single violation may be cause for revocation, and that Ace's violation went to the core of the need for regulation.

¶ 25 On May 15, 2013, the trial court again vacated the Commissioner's decision to revoke Ace's massage establishment license. The court reasoned that it was error for the Commissioner to consider Agent Bauman's testimony, which did not concern Ace in particular but, rather, concerned the general problem of human trafficking and prostitution in massage parlors. The court further reasoned that, even taking into consideration Agent Bauman's testimony, the Commissioner abused his discretion in revoking Ace's license. The court

explained that Ace had a "spotless record" prior to the prostitution incident and that there was no evidence that Kim had knowledge of any illegal activity occurring on the premises. The court remanded to the Commissioner with instructions to impose a lesser sanction than revocation without hearing additional evidence.

¶ 26      On July 11, 2013, the Commissioner issued a written decision suspending Ace's massage establishment license for one year. The Commissioner took into consideration the fact that this was Ace's first violation but emphasized that prostitution was a serious violation.

¶ 27      On September 16, 2013, the trial court vacated the Commissioner's decision to impose a one-year suspension. The court determined that ordinance section 8.2016(a) vested the Commissioner with authority either to revoke Ace's massage establishment license or to suspend it for no more than 30 days. In accordance with Ace's request, the court ruled that the 72-day period from October 3 to December 14, 2011, during which Ace's license was revoked, would serve as the sanction for its ordinance violation and that no further sanction would be imposed. The Village timely appeals.

¶ 28                                            II. ANALYSIS

¶ 29      On appeal, the issue in both cases is whether the Commissioner abused his discretion in revoking plaintiffs' massage establishment licenses. In its appeal, King's argues that the Commissioner's decision to revoke its massage establishment license was an abuse of discretion and should be reversed. [2] In the Ace matter, the Village argues that the Commissioner's decision to revoke Ace's massage establishment license was not an abuse of discretion and should be affirmed. The Village does not specify whether it is referring to the Commissioner's original decision to revoke Ace's license or the Commissioner's decision to do so on the first remand. However, because the trial court's December 14, 2011, and May 15, 2013, orders vacating the Commissioner's revocation decisions and remanding the matter to the Commissioner were not final and appealable orders, we have jurisdiction to review both of the Commissioner's revocation decisions. See *Williams v. Illinois Civil Service Comm'n*, 2012 IL App (1st) 101344, ¶ 9 ("Where, as here, the circuit court remanded the matter to the Commission to impose a lesser penalty than the original penalty of discharge, we can review the Commission's original decision to discharge."); see also *Page v. City of Chicago*, 299 Ill. App. 3d 450, 458-59 (1998) (holding that, in a case involving a petition for writ of *certiorari*, a trial court's orders remanding the matter to the agency were not final and appealable orders).

¶ 30                           A. Ace's Request to Strike Portions of the Village's
                                     Brief in Appeal No. 2-13-0978

¶ 31      In appeal No. 2-13-0978, Ace requests that we strike portions of the Village's brief. In its brief, the Village cites three news articles addressing prostitution stings in massage businesses,

---

[2]King's actually argues that the Commissioner's decision to revoke its massage establishment license was clearly erroneous, but, as we discuss below, we review the Commissioner's decision of which sanction to impose for an abuse of discretion.

the results of a Google search of the phrase "massage parlors and prostitution law enforcement," a report drafted by the Polaris Project on the problem of human trafficking and prostitution in massage parlors, and a blog entry from the Washington Post's website discussing raids of Asian massage parlors. Ace contends that the Village's citations to these sources are improper because it did not introduce the sources at the hearings before the Commissioner.

¶ 32    "[A] court on administrative review is limited to a consideration of the evidence submitted in the administrative hearing and may not hear additional evidence ***." *Acevedo v. Department of Employment Security*, 324 Ill. App. 3d 768, 773 (2001); see also *Tanner v. Court of Claims*, 256 Ill. App. 3d 1089, 1091 (1994) (noting the same rule in the context of a petition for writ of *certiorari*). The record reveals that the three news articles, the Polaris Project report, and the Washington Post blog entry were submitted to the Commissioner on the first remand; however, the Google search results were not. Therefore, we grant Ace's request to strike the portion of the Village's brief citing and discussing the Google search results.

¶ 33    Ace also asks us to strike the portion of the Village's brief discussing Agent Bauman's testimony. Ace contends that the agent's testimony is irrelevant and prejudicial. Because the agent's testimony was submitted at a hearing before the Commissioner and is part of the record, we decline to strike the Village's discussion of it.

¶ 34                                B. Standard of Review

¶ 35    The common-law writ of *certiorari* provides a means for review of actions taken by a court or other tribunal exercising quasi-judicial functions, where no other means of review is available. *Portman v. Department of Human Services*, 393 Ill. App. 3d 1084, 1087 (2009). Where the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2012)) has not been expressly adopted, the writ of *certiorari* survives as a means of judicial review. *Stratton v. Wenona Community Unit District No. 1*, 133 Ill. 2d 413, 427 (1990). Although traditionally review by common-law writ of *certiorari* was very limited, the supreme court has held that the differences that at one time existed between *certiorari* proceedings and proceedings under the Administrative Review Law have been "all but lost." *Dubin v. Personnel Board*, 128 Ill. 2d 490, 498 (1989). "[T]he nature and extent of judicial review is virtually the same under both methods." *Dubin*, 128 Ill. 2d at 498.

¶ 36    In administrative review cases, the appellate court reviews the decision of the agency, not that of the trial court. *Lindemulder v. Board of Trustees of the Naperville Firefighters' Pension Fund*, 408 Ill. App. 3d 494, 500 (2011). Where an agency has imposed a sanction, such as revoking a license or discharging an employee, courts use a two-step review process. *Hermesdorf v. Wu*, 372 Ill. App. 3d 842, 851-52 (2007) (applying a two-step review to a decision to discharge an employee); *Byrne v. Stern*, 103 Ill. App. 3d 601, 605-06 (1981) (applying a two-step review to a liquor commissioner's decision to revoke a liquor license). First, the court determines whether the agency's factual findings are against the manifest weight of the evidence. *Byrne*, 103 Ill. App. 3d at 606. An agency's findings are against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *Roach Enterprises, Inc. v. License Appeal Comm'n*, 277 Ill. App. 3d 523, 528 (1996). Second, the

court determines whether the findings of fact support the sanction imposed. *Roach Enterprises*, 277 Ill. App. 3d at 528. The second step requires determining whether the agency acted arbitrarily or in clear abuse of its discretion. *Roach Enterprises*, 277 Ill. App. 3d at 528. "[A] reviewing court will not interfere with an agency's decision to impose a certain sanction unless the agency acted unreasonably or arbitrarily or chose a sanction that is unrelated to the purpose of the statute." *Albazzaz v. Department of Professional Regulation*, 314 Ill. App. 3d 97, 101 (2000). " '[T]he mere fact [that] a reviewing court considers a different sanction more appropriate does not render a decision arbitrary.' " *Roach Enterprises*, 277 Ill. App. 3d at 530 (quoting *Yeksigian v. City of Chicago*, 231 Ill. App. 3d 307, 312 (1992)).

¶ 37    The parties do not dispute the Commissioner's findings that plaintiffs violated ordinance section 8.2016(a)(3), in that a King's employee and an Ace employee each committed a prohibited act of prostitution on the premises. Nor do the parties dispute that, under the plain language of ordinance section 8.2016(a)(3), revocation was an available sanction for the violations. The issue over which the parties disagree is whether the Commissioner abused his discretion in revoking plaintiffs' massage establishment licenses.

¶ 38                    C. Commissioner's Revocation of Plaintiffs' Licenses

¶ 39    Both plaintiffs argue that, because the Village failed to produce any evidence that they had prior ordinance violations or knowledge of their employees' prohibited conduct, the Commissioner abused his discretion in revoking their licenses. Plaintiffs rely on *Byrne*, *Hanson v. Illinois Liquor Control Comm'n*, 201 Ill. App. 3d 974 (1990), and *Jacquelyn's Lounge, Inc. v. License Appeal Comm'n*, 277 Ill. App. 3d 959 (1996), in which revocations of liquor licenses were deemed abuses of discretion where the licensees had no prior violations and no knowledge of their employees' prohibited conduct.

¶ 40    In *Byrne*, the local liquor control commissioner of the City of Chicago revoked the defendant's liquor license after a dancer at the defendant's lounge was arrested for prostitution following an undercover investigation. *Byrne*, 103 Ill. App. 3d at 603-04. The appellate court noted that the Liquor Control Act (Ill. Rev. Stat. 1977, ch. 43, ¶ 185) imposes strict liability upon a licensee for all violations of the Act by the licensee's agents and employees. *Byrne*, 103 Ill. App. 3d at 605. Nevertheless, the court held that the commissioner's decision to revoke the liquor license was an abuse of discretion. *Byrne*, 103 Ill. App. 3d at 606-07. The court reasoned that the administrative record revealed that the defendant had no prior violations during the 14 years he operated the lounge or during the 33 years he held a liquor license. *Byrne*, 103 Ill. App. 3d at 606. The court further reasoned that the record contained no evidence that the defendant had prior personal knowledge of the dancer's prohibited conduct. *Byrne*, 103 Ill. App. 3d at 606.

¶ 41    Like the court in *Byrne*, the courts in *Jacquelyn's Lounge* and *Hanson* each held that a liquor commissioner's decision to revoke a liquor license was an abuse of discretion where the licensee had no history of prior violations and no knowledge of its employee's prohibited conduct. *Jacquelyn's Lounge*, 277 Ill. App. 3d at 966-67; *Hanson*, 201 Ill. App. 3d at 983-84. In both cases, bar employees were caught selling narcotics on the licensed premises. *Jacquelyn's Lounge*, 277 Ill. App. 3d at 963; *Hanson*, 201 Ill. App. 3d at 977. In *Jacquelyn's*

- 9 -

*Lounge*, the licensee had operated its business for 9½ years without any prior violations (*Jacquelyn's Lounge*, 277 Ill. App. 3d at 967), and in *Hanson* the licensee had operated its business for 5½ years without any violations (*Hanson*, 201 Ill. App. 3d at 984). In neither case was there any evidence that the licensee knew of its employee's prohibited conduct. *Jacquelyn's Lounge*, 277 Ill. App. 3d at 967; *Hanson*, 201 Ill. App. 3d at 983-84.

¶ 42    Before we can decide whether to apply the holdings of *Byrne*, *Hanson*, and *Jacquelyn's Lounge* to the massage establishment context, as plaintiffs urge us to do, we must address the Village's two arguments. First, the Village contends that, *Byrne*, *Hanson*, and *Jacquelyn's Lounge* aside, there is precedent in Illinois for revoking a license for a single ordinance violation. The Village cites *Roach Enterprises*, *Feliciano v. Illinois Racing Board*, 110 Ill. App. 3d 997 (1982), *Spiros Lounge, Inc. v. Illinois Liquor Control Comm'n*, 98 Ill. App. 3d 280 (1981), and *S&F Corp. v. Bilandic*, 62 Ill. App. 3d 193 (1978). Second, the Village argues that, given the seriousness of the problem the massage business ordinance aims to ameliorate, the difficulty of enforcing the ordinance's provisions and regulating massage establishments, and the nature of the violations that took place, the Commissioner's decisions to revoke plaintiffs' licenses were reasonable and not abuses of discretion. In other words, the Village contends that the holdings of *Byrne*, *Hanson*, and *Jacquelyn's Lounge* should not be applied to the massage establishment context.

¶ 43    The problem with the Village's first argument is that, in each of the cases it cites in support of the proposition that a single ordinance violation may serve as the basis for a license revocation, the licensee had knowledge of the prohibited conduct, participated directly in the prohibited conduct, or had a history of prior violations. Accordingly, the cases are distinguishable. In *Roach Enterprises*, the licensee's liquor license was revoked after police discovered unregistered handguns in the licensee's restaurant. *Roach Enterprises*, 277 Ill. App. 3d at 524. The court upheld the revocation, at least in part because the licensee conceded that he had personal knowledge of the firearms violations. *Roach Enterprises*, 277 Ill. App. 3d at 529. In *Feliciano*, the court upheld the revocation of a horse jockey's license after he was found in possession of an illegal horse-prodding device. *Feliciano*, 110 Ill. App. 3d at 998, 1006. The court distinguished *Byrne* on the basis that the jockey was in knowing possession of the device. *Feliciano*, 110 Ill. App. 3d at 1006. In *Spiros Lounge*, the court affirmed the revocation of a liquor license after one of the licensee's employees served alcohol to a minor; only five months earlier, the license had been suspended for a similar violation. *Spiros Lounge*, 98 Ill. App. 3d at 287. In *S&F Corp.*, the revocation of a liquor license was affirmed where the licensee had "intimate knowledge" of the prostitution operation being conducted on the premises and received the proceeds of the operation. *S&F Corp.*, 62 Ill. App. 3d at 198. As plaintiffs contend, these cases are distinguishable because there was no evidence that plaintiffs had prior violations or any knowledge of their employees' prohibited conduct.

¶ 44    We now turn to the Village's second argument. The Village contends that (1) the problem of prostitution operations masquerading as massage establishments is a serious and growing problem, (2) regulation of these facilities is difficult because the illicit activities are clandestine and occur behind closed doors, and (3) ordinance violations involving prostitution go to the "core" of the need for regulation. Relying on these considerations, the Village contends that

massage establishments are distinguishable from businesses operating under liquor licenses and that, therefore, we need not follow *Byrne*, *Hanson*, and *Jacquelyn's Lounge*. In essence, the Village contends that, in the context of a prostitution incident in a massage establishment, the absence of prior violations or evidence that a licensee knew of its employee's prohibited conduct does not render a decision to revoke a massage establishment license an abuse of discretion.

¶ 45    We agree with the Village. Although the constitutionality of the Village's ordinance is not at issue, it is noteworthy that Illinois courts have upheld similar massage establishment ordinances as valid exercises of local governments' police powers. *Clevenger v. City of East Moline*, 44 Ill. App. 3d 168, 172 (1976); *Wes Ward Enterprises, Ltd. v. Andrews*, 42 Ill. App. 3d 458, 466 (1976). In *Wes Ward Enterprises*, the court held that the City of Peoria's massage business ordinance was a reasonable means of carrying out the public purposes sought to be accomplished. *Wes Ward Enterprises*, 42 Ill. App. 3d at 466. The court specifically explained that the ordinance provisions prohibiting nudity and the touching of sexual and genital areas were "obviously designed to proscribe such unlawful conduct, and to prevent unscrupulous persons from permitting massage establishments to be used for purposes of prostitution in violation of the Criminal Code." *Wes Ward Enterprises*, 42 Ill. App. 3d at 466. In *Clevenger*, the court relied on *Wes Ward Enterprises* in upholding the City of East Moline's massage business ordinance. *Clevenger*, 44 Ill. App. 3d at 172. Like the court in *Wes Ward Enterprises*, the court in *Clevenger* noted that certain of the ordinance's provisions were designed to promote the public interest in "the prevention of offenses whereby unscrupulous persons for profit could operate massage establishments for purposes of ministering to the vices of obscenity or prostitution." *Clevenger*, 44 Ill. App. 3d at 172.

¶ 46    As the Village argues, the occurrence of acts of prostitution in a massage establishment is inherently difficult to regulate and prevent. Section 8.2013(c) of the Village's massage business ordinance provides that the sexual or genital areas of a massage patron must be covered by towels, cloths, or undergarments when the patron is in the presence of massage employees. As that section contemplates, massage patrons are at least partially disrobed. Thus, interests of privacy mandate that massages occur behind closed doors. See *Myrick v. Board of Pierce County Commissioners*, 677 P.2d 140, 144 (Wash. 1984) (holding unconstitutional an ordinance provision requiring a two-way viewing portal on massage room doors and noting that "[f]ew persons, if any, would be willing to have an audience during a full body massage, however innocent and legitimate"). Given the private setting in which massage services are provided, prostitution in a massage establishment could be uncovered only by using the type of police operation that occurred in these cases. As the facts of the King's case particularly reveal, prostitution offenders in massage establishments can employ a variety of measures to detect police officers posing undercover as massage patrons, which further elevates the difficulty of policing prostitution operations.

¶ 47    The private nature of the provision of massage services highlights the need for strict regulation. The Village's ordinance defines "Massage" as "[a]ny method of pressure on or friction against, or stroking, kneading, rubbing, tapping, pounding, vibrating or stimulating of the external soft parts of the body with the hands or with aid of any mechanical electrical

- 11 -

apparatus or appliances." Downers Grove Municipal Code § 8.2001 (amended Jan. 18, 2005). As we noted above, massage patrons usually are partially disrobed, and the massage takes place in a private room behind a closed door. The California Court of Appeal has noted that the need for regulation of massage establishments arises in part out of "the ease with which [a business] can be diverted in whole or part to an unlawful business," *i.e.*, prostitution. *Owens v. City of Signal Hill*, 201 Cal. Rptr. 70, 73 (Cal. Ct. App. 1984).

¶ 48    With this background in mind, we cannot say that the Commissioner abused his discretion in revoking plaintiffs' massage establishment licenses under the facts of these cases. We agree with the Village that, due to the nature of the problem the ordinance aims to prevent and the difficulty of policing that problem, the liquor license cases on which plaintiffs rely are distinguishable. Therefore, we decline to apply in this context the holdings of *Byrne*, *Hanson*, and *Jacquelyn's Lounge* that it is an abuse of discretion to revoke a liquor license where a licensee has no prior violations and no knowledge of his or her employees' prohibited conduct.

¶ 49    The ordinance violations that occurred here were serious violations that went to the essence of the problem that the Village's ordinance is aimed to prevent. The ordinance does not provide for progressive discipline but, rather, makes revocation available as a sanction for a first offense. Although plaintiffs may view revocation as a harsh sanction, the Ohio Court of Appeals, in discussing a similar ordinance that made licensees responsible for the prohibited conduct of their agents and employees, noted that the ordinance required "a licensed operator to operate the establishment in such a fashion as to prevent others from engaging in conduct relating to prostitution." *Oglesby v. City of Toledo*, 635 N.E.2d 1319, 1323 (Ohio Ct. App. 1993). The court analogized the ordinance to a health ordinance that would not allow a restaurateur to avoid responsibility for a failure to maintain standards of cleanliness merely by being ignorant of the violations. *Oglesby*, 635 N.E.2d at 1323; see also *WISAM 1, Inc. v. Illinois Liquor Control Comm'n*, 2014 IL 116173, ¶ 32 (reasoning that the purpose of the Liquor Control Act's strict liability provision (235 ILCS 5/10-3 (West 2010)) "is to ensure that the holder of a license for alcoholic beverages has an affirmative responsibility to see that his liquor business is not conducted by its employees in violation of the law"). While revocation of a massage establishment license for a single prostitution incident might be a very strong sanction where the licensee has no history of violations and no knowledge of his or her employees' prohibited conduct, we cannot say that such a strong sanction necessarily is an abuse of discretion.

¶ 50    In concluding that it was not an abuse of discretion for the Commissioner to revoke plaintiffs' massage establishment licenses, we emphasize that King's presented no mitigation evidence whatsoever at the hearing before the Commissioner. We also emphasize that, while Ace presented some mitigation evidence in the form of Kim's testimony, the Commissioner gave that evidence little weight. In particular, the Commissioner gave little weight to the evidence that Kim was in ill health, that he had invested money in the business, and that he had recently renewed his lease. We cannot say that it was error to give this evidence little weight, as none of it had any relation to the prevention of prostitution in the massage spa.

¶ 51    Further, the Commissioner found that Kim's policy regarding illegal activity "fail[ed] to address the seriousness" of the prostitution incident at the spa. The Commissioner did not err in

reaching this conclusion. As the Ohio court in *Oglesby* reasoned, the ordinance, as applied by the Commissioner, requires a massage establishment licensee to operate his or her business in a manner aimed at preventing prostitution. As the Village argues, Kim's testimony indicated that essentially he was an absentee owner who visited the spa once a month to receive a report from the manager and to pay certain bills. While Kim testified that his primary criterion in hiring is "no tolerance for any illegal activity," he further testified that the manager made all hiring decisions. Kim testified that he had owned the business since 1999, yet he offered paltry evidence of measures aimed to prevent prostitution. Kim testified that he merely instructed his manager to inform him of any improper or illegal activities at the business. While the Commissioner's decisions in these cases might have been abuses of discretion had plaintiffs presented adequate mitigation evidence suggestive of robust managerial programs aimed at the prevention of prostitution and implemented prior to the violations, his revocation decisions were not abuses of discretion on these facts.

¶ 52    In affirming the Commissioner's revocation of Ace's license, although Agent Bauman's testimony in Ace's case played no part in our analysis, we note that we cannot say that it was improper for the Village to present the testimony before the Commissioner's designated hearing officer. Administrative agencies are not bound by the strict rules of evidence that apply in a judicial proceeding. 735 ILCS 5/3-111(b) (West 2012); *Chamberlain v. Civil Service Comm'n*, 2014 IL App (2d) 121251, ¶ 47. Only if an agency's failure to observe the technical rules of evidence "materially affected the rights of any party and resulted in substantial injustice" will it constitute grounds for reversal of an administrative decision. 735 ILCS 5/3-111(b) (West 2012). Here, the Village introduced the agent's testimony by stating that it would not concern "anything about Ace Spa in particular" but would concern the "problems endemic to what are commonly referred to as *** Asian massage parlors, or *** Korean massage parlors." Agent Bauman's testimony served to inform the hearing officer of some of the policy concerns underlying the Village's ordinance and of the serious societal problems that the Village sought to deter by strictly enforcing its provisions. The testimony did not materially affect Ace's rights or result in substantial injustice, because the Village admitted that it did not concern Ace specifically. Nevertheless, we need not rely on Agent Bauman's testimony, because the Village did not present it (or the news articles, the Washington Post blog entry, or the Polaris Project report) until the first remand, while we are affirming the Commissioner's original revocation decision.

¶ 53                             D. Ace's Due Process Argument

¶ 54    In appeal No. 2-13-0978, Ace argues that revocation of its massage business license would violate its due process rights. It contends that the Village's ordinance either eliminates any knowledge requirement or contains an impermissible presumption that a licensee has knowledge of its employees' prohibited activities occurring on the premises. Ace raised this argument before the Commissioner and the trial court, although neither entity explicitly addressed the issue. On appeal, Ace offers this argument as an alternative basis for vacating, as the trial court did, the Commissioner's revocation decisions.

¶ 55 It is unclear whether Ace is arguing that the Commissioner's revocation decisions violated procedural due process or substantive due process. " '[W]hereas procedural due process governs the procedures employed to deny a person's life, liberty or property interest, substantive due process limits the state's ability to act, irrespective of the procedural protections provided.' " *People v. Cardona*, 2013 IL 114076, ¶ 17 (quoting *In re Marriage of Miller*, 227 Ill. 2d 185, 197 (2007)). Ace argues that it was denied a meaningful hearing in that the Commissioner failed to consider Kim's lack of knowledge of his employee's illegal conduct, which suggests a procedural due process challenge, but relies on *Brennan v. Illinois Racing Board*, 42 Ill. 2d 352 (1969), which involved a substantive due process analysis.

¶ 56 When determining whether an individual has received procedural due process, courts look to three factors: (1) " 'the private interest that will be affected by the official action' "; (2) " 'the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards' "; and (3) " 'the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.' " *In re Robert S.*, 213 Ill. 2d 30, 48-49 (2004) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). "By weighing these factors, courts can determine whether the government has met the fundamental requirements of due process–the opportunity to be heard at a meaningful time and in a meaningful manner." *Robert S.*, 213 Ill. 2d at 49.

¶ 57 When addressing a substantive due process challenge, the court's analysis depends on the nature of the right purportedly being infringed. *In re J.W.*, 204 Ill. 2d 50, 66 (2003). Where a statute does not implicate a fundamental constitutional right, courts employ the rational basis test to determine the constitutionality of a statute. *Miller*, 227 Ill. 2d at 197. "Under this test, the statute need only bear a reasonable relationship to a legitimate state interest." *Miller*, 227 Ill. 2d at 197 (citing *Washington v. Glucksberg*, 521 U.S. 702, 722 (1997)).

¶ 58 Here, Ace's failure to clearly differentiate between procedural and substantive due process subjects its argument to forfeiture. Ace does not explicitly address the three factors of a procedural due process analysis. If it is relying on substantive due process, Ace does not discuss whether a fundamental constitutional right is implicated or, if not, whether the rational basis test is satisfied. Ace's failure to present a meaningful procedural or substantive due process challenge renders the argument forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013) ("[p]oints not argued are waived"); *Cardona*, 2013 IL 114076, ¶ 19 (declining to address a substantive due process challenge where the defendant failed to discuss "even the basic principles of substantive due process").

¶ 59 However, forfeiture is a limitation on the parties, not on courts of review. *People v. Yaworski*, 2011 IL App (2d) 090785, ¶ 10. Ace's forfeiture aside, its due process argument lacks merit. Rather than untangle the procedural and substantive aspects of its argument, we address the two cases on which Ace relies, *Brennan* and *Lee v. City of Newport*, No. 91-5158, 1991 WL 227750 (6th Cir. Nov. 5, 1991).

¶ 60 In *Brennan*, a provision of the Illinois Horse Racing Act made horse trainers the " 'absolute insurer[s]' " of the condition of their horses " 'regardless of the acts of a third party.' " *Brennan*, 42 Ill. 2d at 353 (quoting Ill. Rev. Stat. 1967, ch. 8, ¶ 37c-3). Following a

race, a stimulant was discovered in the urine of a horse, and the Illinois Racing Board revoked its trainer's license without making a finding that the trainer himself was guilty of any misconduct. *Brennan*, 42 Ill. 2d at 354. On appeal, the supreme court held that the "absolute insurer" statutory provision was arbitrary and unreasonable and not a legitimate exercise of the state's police power. *Brennan*, 42 Ill. 2d at 355-58.

¶ 61    Ace's reliance on *Brennan* is unavailing. Employing a substantive due process analysis, the court in *Brennan* reasoned that the statute penalizing horse trainers for the acts of third parties was arbitrary and unreasonable because a fault-based provision would be equally effective at inducing trainers to take precautions to prevent tampering with horses. *Brennan*, 42 Ill. 2d at 357. Moreover, the court observed, a trainer could lose his or her license regardless of the level of precautions imposed–for example, if a disgruntled former employee "doped [a] horse." *Brennan*, 42 Ill. 2d at 358. The court held that the rule had no "real and substantial relation to the protection of race track patrons against fraud or deceit." *Brennan*, 42 Ill. 2d at 357. The court further noted: "It is a fundamental principle of Anglo-Saxon justice that responsibility is personal and that penalties may not be inflicted on one person because of another's acts." *Brennan*, 42 Ill. 2d at 356.

¶ 62    Here, section 8.2016(a)(3) of the Village's ordinance provides that a massage establishment license is subject to suspension or revocation if "[t]he Licensee or any massage therapist practicing at the licensed premises has committed a *** Specified Criminal Act *** on the Licensed Premises." Downers Grove Municipal Code § 8.2016(a)(3) (amended Jan. 18, 2005). Unlike the provision of the Horse Racing Act at issue in *Brennan*, the ordinance does not make a licensee liable for the acts of third parties over which the licensee has no control but, rather, penalizes the licensee for acts of employees under its control. As we discussed above, Ace might have been able to avoid the penalty of revocation had it presented adequate mitigation evidence of precautions aimed at preventing prostitution, implemented prior to the violations. See *Oglesby*, 635 N.E.2d at 1322-23 (upholding a similar massage ordinance in the face of a substantive due process challenge). Instead, Ace's mitigation evidence painted a picture of an absentee owner who, over the course of 12 years, implemented practically no measures aimed at preventing prostitution. Application of the Village's ordinance in this manner does not run afoul of the principles discussed in *Brennan*.

¶ 63    *Lee*, the second case on which Ace relies, is an unpublished decision of the Sixth Circuit Court of Appeals. Unpublished federal decisions are not binding or precedential in Illinois courts. *Kerbes v. Raceway Associates, LLC*, 2011 IL App (1st) 110318, ¶ 34. Moreover, although nothing prevents this court from using the same reasoning and logic as that used in an unpublished federal decision (*Osman v. Ford Motor Co.*, 359 Ill. App. 3d 367, 374 (2005)), the reasoning and logic used in *Lee* is not persuasive.

¶ 64    At issue in *Lee* was the constitutionality of an occupational licensing ordinance applicable to an adult-oriented entertainment establishment. *Lee*, 1991 WL 227750, at *1. The ordinance provided, in pertinent part, that a license was subject to revocation if the licensee or any of its agents or employees was convicted of any crime occurring on the licensed premises. *Lee*, 1991 WL 227750, at *1. The plaintiff's license was revoked based on two employees' convictions of prostitution. *Lee*, 1991 WL 227750, at *1. In holding that the ordinance violated due process,

- 15 -

the court reasoned that "[t]he effect of the ordinance is either to create a presumption of knowledge or to eliminate any requirement of knowledge on the part of the licensee or operator of illegal activities or prohibited conduct on the premises." *Lee*, 1991 WL 227750, at *4. The court further reasoned that "[n]othing that [the licensee] could have shown at her hearing before the City commissioners *** would have prevented the ordinance from being applied as written." *Lee*, 1991 WL 227750, at *7.

¶ 65    Underlying the court's decision in *Lee*–which failed to articulate whether its analysis was rooted in procedural or substantive due process–is the unstated and unsupported presumption that an ordinance allowing for the revocation of a license based on an employee's illegal or prohibited acts must include knowledge as an element. The court reasoned that "a hearing which excludes consideration of an element essential to the decision" was not a meaningful hearing. (Internal quotation marks omitted.) *Lee*, 1991 WL 227750, at *6. Yet the court did not explain why knowledge–which the ordinance at issue did not require–was an essential element.

¶ 66    We find more persuasive than *Lee* the Ohio Court of Appeals' decision in *Oglesby*, which upheld a similar massage ordinance in the face of a substantive due process challenge. *Oglesby*, 635 N.E.2d at 1322-23. The court in *Oglesby* reasoned that the ordinance at issue–which permitted revocation of a license where "either the establishment, operator, and/or technician" engaged in an act of prostitution on the licensed premises–was reasonably related to preventing prostitution where the ordinance, as applied by the massage board, "would require a licensed operator to operate the establishment in such a fashion as to prevent others from engaging in conduct relating to prostitution." *Oglesby*, 635 N.E.2d at 1323; see also *WISAM 1, Inc.*, 2014 IL 116173, ¶ 32 (reasoning that the purpose of the Liquor Control Act's strict liability provision "is to ensure that the holder of a license for alcoholic beverages has an affirmative responsibility to see that his liquor business is not conducted by its employees in violation of the law"). The same is true here; as applied by the Commissioner, ordinance section 8.2016(a)(3) is reasonably related to the governmental interest in preventing prostitution at massage establishments.

¶ 67                                    III. CONCLUSION

¶ 68    For the foregoing reasons, we hold that the Commissioner did not abuse his discretion in revoking either King's or Ace's massage establishment license. Accordingly, in appeal No. 2-13-0825 (King's), we affirm the decisions of the circuit court of Du Page County and the Commissioner. In appeal No. 2-13-0978 (Ace), we reverse the decisions of the circuit court of Du Page County and the decisions of the Commissioner on the first and second remands. Pursuant to our authority under Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994), in lieu of remanding to the circuit court, we hereby deny Ace's original petition for writ of *certiorari* and reinstate the Commissioner's original decision to revoke Ace's license.

¶ 69    No. 2-13-0825, Affirmed.

¶ 70    No. 2-13-0978, Reversed; judgment entered.