# Illinois Official Reports

## Appellate Court

*Solargenix Energy, LLC v. Acciona, S.A.*, 2014 IL App (1st) 123403

| | |
|---|---|
| Appellate Court Caption | SOLARGENIX ENERGY, LLC, Individually and Derivatively on Behalf of Acciona Solar Power, Inc., Plaintiff-Appellee, v. ACCIONA, S.A., and ACCIONA ENERGÍA, S.A., Defendants-Appellants (Acciona Solar Energy, LLC, Acciona Solar Power, Inc., Acciona Energy North America Corporation, Defendants). |
| District & No. | First District, Fifth Division<br>Docket No. 1-12-3403 |
| Filed | August 1, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court properly denied defendants' motion to dismiss for lack of personal jurisdiction plaintiff's action raising various claims based on defendants' alleged breach of the parties' joint venture agreements for the worldwide development of thermosolar power plants, including a forum selection provision consenting to the jurisdiction of any state or federal court situated in Chicago, Illinois, notwithstanding defendants' contention that they were only parent entities of the United States subsidiaries directly involved in the joint ventures, since the trial court found that defendants were so closely related to the dispute that they could not reasonably claim that they were surprised to be sued for claims arising from the joint ventures. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-L-3036; the Hon. Sanjay Tailor, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Mayer Brown LLP, of Chicago (Michele Odorizzi, Michael R. Feagley, and Ethan A. Hastert, of counsel), for appellants.

Sidley Austin LLP, of Chicago (Thomas K. Cauley, Jr., Robert N. Hochman, and Ashley K. Martin, of counsel), for appellee.

Panel

JUSTICE PALMER delivered the judgment of the court, with opinion.
Presiding Justice Gordon and Justice Taylor concurred in the judgment and opinion.

## OPINION

¶ 1 Plaintiff Solargenix Energy, LLC (Solargenix), filed the instant suit against defendants raising various claims related to defendants' alleged breach of joint venture agreements with Solargenix. Defendants-appellants Acciona, S.A. (Acciona), and Acciona Energia, S.A. (together, the Spanish defendants) filed a motion to dismiss for lack of personal jurisdiction. The circuit court denied the motion. This court granted the Spanish defendants' petition for leave to appeal that decision pursuant to Supreme Court Rule 306(a)(3). Ill. S. Ct. R. 306(a)(3) (eff. Feb. 16, 2011). For the reasons that follow, we affirm.

¶ 2 I. BACKGROUND[1]

¶ 3 According to Solargenix, in 2005 it was a leader in the concentrating solar power market in the United States and it was constructing a large-scale concentrating thermosolar power plant in Nevada called "Nevada Solar One." In November 2005, the Spanish defendants' United States subsidiaries and Solargenix formed a joint venture and they executed several related agreements to that end. Solargenix claimed that Acciona, a publicly traded, global renewable energy company, sought Solargenix's solar power technology and expertise, while Solargenix was interested in gaining access to Acciona's worldwide network and resources.

¶ 4 According to Solargenix's complaint, Solargenix is a North Carolina limited liability company with its principal place of business in North Carolina. Acciona and Acciona Energia are Spanish corporations with their principal places of business in Spain. Acciona Energia is directly wholly owned by another corporation, which is in turn directly wholly owned by Acciona. Acciona Energy North America Corporation (Acciona North America) and Acciona Solar Energy, LLC (Acciona Solar Energy), are United States subsidiaries. Acciona North America is a directly, wholly owned subsidiary of a corporation which is in turn directly and wholly owned by Acciona Energia, and is organized under Delaware law with its principal place of business in Chicago, Illinois. Acciona Solar Energy is a wholly owned subsidiary of Acciona North America and is a Delaware limited liability company with its principal place of business in Chicago.

---

[1]The factual allegations are taken from the complaint and the parties' briefs and accompanying exhibits filed in the circuit court.

¶ 5    Pursuant to the joint venture agreements, the parties formed a joint venture entity, initially called Solargenix Energy, Inc., but later renamed Acciona Solar Power, Inc. (ASP),[2] which was to serve as their exclusive vehicle for developing thermosolar power plants worldwide (except for Spain and China, which were specifically carved out). However, Solargenix alleged in its complaint that defendants[3] fraudulently induced it to form the joint venture so that they could obtain ownership of Solargenix's valuable proprietary solar technology, employees, and expertise, in order to pursue other projects outside of the joint venture and at the expense of developing ASP, which eventually caused ASP to become insolvent.[4]

¶ 6    In its complaint, Solargenix alleged that, in an effort to rid itself of the partnership with Solargenix, defendants ultimately "manufactured" a deadlock on the ASP board of directors and sent a purchase notice to Solargenix in September 2010, invoking the buy/sell provision of the shareholders agreement.[5] Solargenix indicated that Acciona also attempted to condition the purchase notice on Solargenix waiving any claims against Acciona, but Acciona removed this restriction after Solargenix filed a complaint in the chancery court contesting it. Solargenix ultimately agreed to sell its interest in ASP for $11.5 million. Solargenix asserted that, by that

---

[2]For the sake of clarity, we will refer to the joint venture entity as ASP throughout this opinion.

[3]We note that it is somewhat difficult to discern Solargenix's specific contentions with regard to each defendant, as it refers generally to defendants as "Acciona" throughout its complaint and brief.

[4]In particular, alleged instances of neglect and breach of the joint venture agreements included: (1) failure to appoint a chief executive officer (CEO) of ASP for 3½ years; (2) failure to implement a competitive compensation package for employees; (3) failure to fill key management positions in ASP; (4) failure to convene regular board meetings of ASP; (5) refusal of the Solargenix board members' requests for action; (6) failure to promote ASP and at the same time pursuing other projects and informing third parties not to concern themselves with ASP; and (7) forming joint venture partnerships outside of ASP.

Solargenix also alleged that in 2005 and 2006, the Acciona-appointed general manager of ASP, Paxti Landa, abandoned negotiations with an energy company to build five plants without presenting the opportunity to Solargenix's board members of ASP. Further, in 2006, John Myles met with Google CEO Larry Page regarding Google's interest in investing in concentrating solar power projects through ASP, but defendants refused to meet or cause ASP to meet with Google. In addition, John Myles referred Cogentrix Energy, LLC, to Acciona for potentially developing solar power projects in the United States, but Acciona told Cogentrix that it need not deal with ASP and could deal directly with Acciona. Acciona also unilaterally instructed ASP not to pursue an opportunity to construct "Nevada Solar Two," even though ASP had been "short listed" for the project.

Additionally, Solargenix alleged that Acciona violated the joint venture agreements and tortiously interfered with the joint venture agreements by entering into an agreement with Mitsubishi to pursue thermosolar energy projects worldwide, including entering into a memorandum of understanding in 2009 and submitting a joint application with Mitsubishi in 2010 to the Australian government for the construction a $1.2 billion solar power plant in Australia.

[5]The buy/sell provision provided that when one shareholder offered to buy all of the other shareholder's shares in ASP, the other shareholder must respond within 30 days by either purchasing the notifying shareholder's shares or selling all of its own shares.

time, Acciona's neglect of ASP had rendered ASP insolvent and reduced the value of the shares, and had it purchased Acciona's shares instead, it would have been left with a worthless company.

¶ 7 After completion of the sale in 2011, Solargenix filed an initial complaint seeking rescission of the joint venture agreements and compensatory damages of more than $100 million, among other relief. Solargenix later filed an amended complaint in which it alleged that Acciona Energia, Acciona North America, and Acciona Solar Energy fraudulently induced it to enter into the joint venture agreements; breach of contract by Acciona Energia (with respect to the letter of adhesion it executed, discussed further, *infra*); tortious interference with contractual rights against Acciona for allegedly causing Acciona Energia and the United States subsidiaries to breach the joint venture agreements; and unjust enrichment against Acciona and Acciona Energia for the alleged torts.

¶ 8 ### A. Joint Venture Agreements

¶ 9 Solargenix alleged in its complaint that its principal, John Myles, initially contacted the chief executive officer (CEO) of Acciona Energia, Esteban Morras, in November 2004 and proposed the creation of a formalized joint venture. In February 2005, Acciona North America and Solargenix signed a cooperation agreement pursuant to which Acciona North America loaned $13 million to Solargenix to finance the development of Nevada Solar One, while retaining the right to convert the loan into a controlling equity investment in Solargenix's solar power plant business.

¶ 10 Several months later, following more negotiations, several days of which occurred in Chicago,[6] an amended cooperation agreement and other joint venture agreements were executed on November 30, 2005. The signatory parties to the amended cooperation agreement were representatives of Solargenix, Acciona Solar Energy, Acciona North America, and ASP. Under the agreements, the $13 million loan debt was canceled and, in exchange, Acciona North America received a 55% interest in ASP, through its subsidiary Acciona Solar Energy. Acciona Solar Energy was granted the right to appoint three of the five board of director positions of ASP and ASP's chief executive officer. Solargenix held a 45% stake in ASP and had the right to appoint two directors and the chief financial officer. Solargenix assigned over its solar power plant division, including its project assets (such as Nevada Solar One, leases, agreements, equipment, technology, patents, intellectual property, and inventory). The amended cooperation agreement provided that the parties intended to amend the initial cooperation agreement "in contemplation of a larger cooperative relationship between the parties."

¶ 11 The amended cooperation agreement also stated in section V, paragraph A, entitled "Worldwide Investment Vehicle":

> "[T]he parties agree that one of the primary business purposes of the Company [ASP] shall be to serve as the investment vehicle for future thermosolar power generation

---

[6]We note that Solargenix argues that John Myles negotiated with Alberto de Miguel, an officer of Acciona North America and an employee of Acciona Energia, and that Myles was under the impression that he was negotiating with the Spanish defendants. On the other hand, the Spanish defendants assert that de Miguel testified in his deposition that he negotiated on behalf of the United States Acciona subsidiaries.

projects undertaken by [Solargenix], [Acciona Solar Energy], or their affiliates worldwide, except in Spain ***. The participation and final ownership of such projects shall be determined according to the respective financial investment and risk assumptions of each of the parties involved, *** but the parties agree that one of the principal purposes of the Company [ASP] is to accrue sufficient available cash so as to invest in and pursue ownership opportunities with respect to such projects. Each party agrees that the opportunity to invest in such projects shall be deemed corporate opportunities of the Company, and may not be pursued by either party outside the Company [ASP] except with the unanimous consent of the Company's Board of Directors."

¶ 12    Under the same section, in paragraph B, entitled "Worldwide Thermosolar Development," it provided:

"[T]he parties agree that one of the primary business purposes of the Company [ASP] shall be to serve as the development, engineering, operations, and management services provider for future thermosolar power generation projects (i) undertaken by third parties and developed by either shareholder or (ii) undertaken by [Solargenix], [Acciona Solar Energy], or their affiliates worldwide, except in Spain and in China ***. Each party agrees that the opportunity to provide development, engineering, operations, and management services to such projects shall be deemed corporate opportunities of the Company [ASP], and may not be pursued by either party outside the Company except with the unanimous consent of the Company's Board of Directors."

¶ 13    Also under section V, in paragraph D, entitled "Future Projects," it stated that Acciona North America agreed to contract with ASP to perform basic engineering and project management for two thermosolar projects in Spain, and that "[t]he parties acknowledge that [Acciona Energia] has agreed that it is bound by the agreements in paragraphs A [(the Worldwide Investment Vehicle provision)], B [(the Worldwide Thermosolar Development provision)], and D above through the Letter of Adhesion."

¶ 14    Under section III, entitled "SPAIN," and paragraph A, "Exclusive Agent," it provided that the parties "discussed an arrangement under which [Acciona North America] would become the exclusive agent of [Solargenix and ASP] in Spain for solar thermal power plants" and the parties agreed to negotiate further in that regard in good faith. It further provided that "[t]he parties acknowledge that Acciona Energia, SA ('Acciona') has agreed that it is bound by this agreement through the letter of adhesion attached hereto."

¶ 15    Additionally, in section VIII, entitled "MISCELLANEOUS," the amended cooperation agreement contained a provision which designated Illinois law as the law governing the agreement. It also contained the following forum selection provision:

"G. Consent to Jurisdiction; Waiver. **The parties hereby consent to the exclusive jurisdiction of any state or federal court situated in the State of Illinois, City of Chicago, and waive any objection based on lack of personal jurisdiction, improper venue or *forum non conveniens*, with regard to any actions, claims, disputes or proceedings relating to this Agreement, or any document delivered hereunder or in connection herewith, or any transaction arising from or connected to any of the foregoing.** Nothing herein shall affect any party's right to serve process in any manner permitted by law, or limit any party's right to bring

proceedings against the other party or their property or assets in the competent courts or any other jurisdiction or jurisdictions."

¶ 16    Like the amended cooperation agreement, the letter of adhesion was similarly dated November 30, 2005. It was addressed to Solargenix and John and Jeff Myles, and signed by Morras as CEO of Acciona Energia. In the letter, Acciona Energia "acknowledge[d] that certain provisions of the [amended cooperation agreement] *** refer to and affect Acciona Energia, SA *** and some of its other affiliates that are not parties to the [amended cooperation agreement] (hereinafter the 'Relevant ASE Subsidiaries')." Further, Acciona Energia "accept[ed] and consent[ed] to be bound by and to comply with the contents and obligations set forth in the Applicable Sections" of the amended cooperation agreement, and to "cause the Relevant ASE Subsidiaries to comply with the contents and obligations of the Applicable Sections for as long as the Agreement remains in force, provided that ASE [Acciona Solar Energy] or any of its affiliates is a party thereto." The "applicable sections" set forth in the letter of adhesion were: section III, paragraph A, and section V, paragraphs A, B, and D. The letter did not specifically incorporate the forum selection clause of the amended cooperation agreement.

¶ 17    B. Motion to Dismiss

¶ 18    The Spanish defendants moved to dismiss Solargenix's complaint pursuant to section 2-301 of the Illinois Code of Civil Procedure (the Code) (735 ILCS 5/2-301(a) (West 2010)), on grounds that that court lacked personal jurisdiction over them. The parties engaged in extensive briefing and discovery related to the motion to dismiss, and each side submitted numerous exhibits consisting of the joint venture agreements, depositions, affidavits, emails, letters, and other documentation.

¶ 19    The Spanish defendants asserted that there was no basis for specific or general jurisdiction over them because, unlike their United States subsidiaries, they did not have sufficient minimum contacts with Illinois as they did not lease or own property, maintain offices, pay taxes, conduct business, market their services, or maintain employees in Illinois,[7] and jurisdiction in Illinois would be unfair and burdensome. They pointed out that Solargenix was not an Illinois company and ASP did not do business in Illinois, and had only held board of director meetings in Chicago. They also argued that they (Acciona and Acciona Energia) were not signatories to the joint venture agreements. With respect to the letter of adhesion, they asserted that it did not incorporate the forum selection provision of the amended cooperation agreement and it was signed in Spain. The Spanish defendants insisted that its United States subsidiaries, which were signatories to the joint venture agreements, were more than merely "shell" corporations of the Spanish defendants because they owned Nevada Solar One and ASP, and Acciona North America was involved in wind energy and was trying to develop solar plants. The Spanish defendants denied exercising an unusually high degree of control over ASP's daily operations, and noted that corporate formalities were observed. They argued that although Alberto de Miguel (an officer of Acciona North America and an employee of Acciona Energia) made decisions for ASP and was one of the directors of the board, but he was not on the boards of the Spanish defendants. Further, ASP paid its own payroll and was not

_____

[7]Acciona Energia conceded that it occasionally "seconded" employees to Acciona North America.

- 6 -

financially supported by the Spanish defendants, and there were no common directors or comingling of assets.

¶ 20 In opposition to the motion, Solargenix asserted that the court had personal jurisdiction over the Spanish defendants under several provisions of the Illinois long-arm statute (735 ILCS 5/2-209 (West 2010)): (1) the Spanish defendants transacted business in Illinois (section 2-209(a)(1)); (2) they made or performed a contract substantially connected to Illinois based on the performance of the joint venture agreements (section 2-209(a)(7)); and (3) they committed tortious acts within Illinois (section 2-209(a)(2)). Solargenix further asserted that jurisdiction was proper because the parent companies exercised so much control over the subsidiaries such that they were essentially "doing business" in Illinois through their control over their Illinois subsidiaries (735 ILCS 5/2-209(b)(4) (West 2010)). Finally, Solargenix argued that the Spanish defendants were bound by the forum selection clause in the amended cooperation agreement because they were so closely related to the dispute that it was foreseeable they would be bound. Based on its discovery relating to the motion to dismiss, Solargenix asserted that Acciona and Acciona Energia were the parties actually involved in negotiations and decision making, and they were also the only parties with the ability to pursue the purposes of the joint venture, *i.e.*, building thermosolar power generation projects throughout the world through ASP. Solargenix contended that Acciona Solar Energy was created one month before the joint venture agreements for the purpose of holding stock in ASP, it had no employees or operations of its own, it did not hold board of director meetings, and the only person who acted for it was de Miguel, who held a high position at Acciona Energia. Further, Acciona North America was just starting its business at the time, it was not licensed to do business in Illinois, it focused on wind power generation, it did not have worldwide operations, and it had only six employees. Solargenix pointed out that the agreements were negotiated in Chicago, including the letter of adhesion, by Acciona Energia representatives. Solargenix also asserted that the Spanish defendants made decisions for ASP, interviewed job candidates for ASP, resolved personnel issues, set the salary scale, claimed ownership of Nevada Solar One in the press, and decided which projects to pursue.

¶ 21 The parties provided supplemental briefing and additional exhibits in connection with the motion to dismiss. Following oral arguments, the circuit court denied the motion to dismiss and held that it had personal jurisdiction over the Spanish defendants, finding that the Spanish defendants were bound by the forum selection clause because they were so closely related to the dispute that it became foreseeable that they would be bound. The court declined to address the remainder of the jurisdictional arguments advanced by Solargenix.

¶ 22 As stated, we granted Acciona and Acciona Energia's subsequent petition for leave to appeal pursuant to Illinois Supreme Court Rule 306(a)(3) (eff. Feb. 16, 2011).

¶ 23 II. ANALYSIS
¶ 24 A. Standard of Review
¶ 25 When seeking jurisdiction over a nonresident defendant, "the plaintiff has the burden to establish a *prima facie* basis to exercise personal jurisdiction." *Russell v. SNFA*, 2013 IL 113909, ¶ 28. The court considers the " 'uncontroverted pleadings, documents and affidavits, as well as any facts asserted by the defendant that have not been contradicted by the plaintiff.' " *Madison Miracle Productions, LLC v. MGM Distribution Co.*, 2012 IL App (1st) 112334, ¶ 34 (quoting *Cardenas Marketing Network, Inc. v. Pabon*, 2012 IL App (1st) 111645,

¶ 28). "Any conflicts in the pleadings and affidavits must be resolved in the plaintiff's favor, but the defendant may overcome plaintiff's *prima facie* case for jurisdiction by offering uncontradicted evidence that defeats jurisdiction." *Russell*, 2013 IL 113909, ¶ 28. However, "[i]f any material evidentiary conflicts exist, *** the trial court must conduct an evidentiary hearing to resolve those disputes." *Madison Miracle Productions*, 2012 IL App (1st) 112334, ¶ 35. Where the circuit court determines a jurisdictional issue based only on the documentary evidence submitted by the parties, without an evidentiary hearing, this court reviews that decision *de novo*. *Id*. ¶ 34. On appeal, " 'we may affirm the judgment of the trial court on any basis in the record, regardless of whether the trial court relied upon that basis or whether the trial court's reasoning was correct.' " *Garrido v. Arena*, 2013 IL App (1st) 120466, ¶ 36 (quoting *Alpha School Bus Co. v. Wagner*, 391 Ill. App. 3d 722, 734 (2009)).

¶ 26                                   B. Jurisdictional Provisions

¶ 27        The Illinois long-arm statute, section 2-209 of the Code (735 ILCS 5/2-209 (West 2010)), provides several bases upon which Illinois courts may exercise personal jurisdiction over a nonresident defendant. *Cardenas Marketing Network*, 2012 IL App (1st) 111645, ¶ 29. First, section 2-209(a) "outlines specific actions by a defendant that will subject him or her to specific personal jurisdiction in Illinois." *Id.* (citing 735 ILCS 5/2-209(a) (West 2010)). For example, specific jurisdiction over a nonresident defendant exists if the cause of action arose from the transaction of business or committing a tort in Illinois. *Soria v. Chrysler Canada, Inc.*, 2011 IL App (2d) 101236, ¶ 16 (citing 735 ILCS 5/2-209(a) (West 2010)). Second, section 2-209(b) "outlines the instances in which Illinois has general jurisdiction over a nonresident corporation." *Cardenas Marketing Network*, 2012 IL App (1st) 111645, ¶ 29 (citing 735 ILCS 5/2-209(b) (West 2010)). As it pertains to corporations, this includes when a corporation is either organized under Illinois law or is doing business in Illinois. *Soria*, 2011 IL App (2d) 101236, ¶ 16 (citing 735 ILCS 5/2-209(b)(3), (b)(4) (West 2010)). And third, section 2-209(c) "is a 'catchall provision' [citation], which permits Illinois courts to 'exercise jurisdiction on any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States.' [Citation.]" *Cardenas Marketing Network*, 2012 IL App (1st) 111645, ¶ 29 (quoting 735 ILCS 5/2-209(c) (West 2010)). Accordingly, "if the contacts between a defendant and Illinois are sufficient to satisfy both federal and state due process concerns, the requirements of Illinois' long-arm statute have been met, and no other inquiry is necessary." (Internal quotation marks omitted.) *Id*.[8]

¶ 28        Federal due process requires that, in order to exercise personal jurisdiction over a nonresident defendant, the defendant must have " 'certain minimum contacts with [the forum] such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." ' " *Soria*, 2011 IL App (2d) 101236, ¶ 18 (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945), quoting *Milliken v. Meyer*, 311 U.S. 457, 463

_____

[8]We note that, in general, where federal due process requirements for personal jurisdiction are satisfied, Illinois due process concerns are also satisfied. *Madison Miracle Productions*, 2012 IL App (1st) 112334, ¶ 44. "Under the Illinois Constitution's guarantee of due process, '[j]urisdiction is to be asserted only when it is fair, just, and reasonable to require a nonresident defendant to defend an action in Illinois, considering the quality and nature of the defendant's acts' that occur in Illinois or that affect interests located in Illinois." *Compass Environmental, Inc. v. Polu Kai Services, L.L.C.*, 379 Ill. App. 3d 549, 558 (2008) (quoting *Rollins v. Ellwood*, 141 Ill. 2d 244, 275 (1990)).

(1940)). "The minimum contacts necessary for jurisdiction depend on whether the jurisdiction asserted is general or specific." *Id.* To exercise general jurisdiction over a nonresident defendant, it must be shown that the defendant has "continuous and systematic general business contacts, such that it may be sued in the forum state for suits unrelated to its contacts within the forum." (Internal quotation marks omitted.) *Cardenas Marketing Network*, 2012 IL App (1st) 111645, ¶ 30. To exercise specific jurisdiction, a nonresident defendant has sufficient "minimum contacts" where it has "purposefully directed its activities at the forum," and the litigation arises from those activities. (Internal quotation marks omitted.) *Id.* ¶ 33. "Personal jurisdiction is present under such circumstances because, where a defendant has purposefully availed itself of the privilege of conducting activities within a state, it invokes the benefits and protections of the state's laws, and it is therefore not unreasonable to require the defendant to submit to litigation in that forum." *Soria*, 2011 IL App (2d) 101236, ¶ 18.

¶ 29                                              C. Application

¶ 30      The Spanish defendants argue on appeal that because they were not signatories to the amended cooperation agreement, they did not consent to it and it was not foreseeable that they would be bound by the forum selection provision. They contend that the parties deliberately structured their relationship such that the Spanish defendants were not parties to the amended cooperation agreement, and the forum selection clause was not among those expressly adopted by Acciona Energia in the letter of adhesion.[9] The Spanish defendants disagree with the circuit court's conclusion that personal jurisdiction could be established based on the fact that, because they were closely related to the dispute, it was foreseeable that they would be bound by the forum selection clause. They further contend that Solargenix failed to show that they engaged in some action that provided the requisite minimum contacts with Illinois, and, therefore, the court cannot exercise personal jurisdiction over them. At most, whether Acciona Energia had sufficient minimum contacts with the forum to support specific jurisdiction involved questions of fact necessitating an evidentiary hearing. With regard to Acciona specifically, Acciona argues that Solargenix failed to make a *prima facie* showing of personal jurisdiction, and Acciona requests that it be dismissed from the lawsuit.

¶ 31      Solargenix counters that the Spanish defendants should be bound by the forum selection clause because it includes any "action, claims, disputes, or proceedings relating to" the joint venture agreements, all of its claims arise from and relate to the joint venture agreements, and the Spanish defendants were so closely related to the dispute that it was foreseeable that they would be bound by the forum selection clause. Solargenix reiterates that the Spanish defendants were the only entities on the Acciona side that were capable of carrying out the purpose of the joint venture, and Acciona Energia agreed to the central provision of the amended cooperation agreement. Solargenix asserts that ample evidence from discovery on the motion to dismiss supports that both Acciona Energia and Acciona were heavily involved in negotiating and approving the joint venture agreements, and continued to be involved after their approval and formation of ASP.

_____

[9]The Spanish defendants argue that de Miguel averred that, as the negotiator for Acciona North America, the decision not to include the forum selection clause in the letter of adhesion was a deliberate choice, and that this statement was uncontroverted, or at the very least, created a question of fact regarding whether Acciona Energia intended to be bound by the forum selection clause.

¶ 32    The circuit court here did not determine that it had personal jurisdiction over the Spanish defendants based on general jurisdiction (*i.e.*, continuous and systematic contacts with Illinois) or specific jurisdiction (*i.e.*, sufficient minimum purposeful contacts with Illinois and the dispute arose out of those contacts). Rather, the court held that the Spanish defendants were so "closely related" to the dispute such that it became "foreseeable" that they would be bound by the forum selection clause in the amended cooperation agreement.

¶ 33    It is well established that "the personal jurisdiction requirement is a waivable right, [and] there are a 'variety of legal arrangements' by which a litigant may give 'express or implied consent to the personal jurisdiction of the court.' " *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985) (quoting *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982)). This includes forum selection provisions that are agreed to in advance by the parties, where such provisions are freely negotiated and are not unreasonable or unjust. *Id.* See *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 12-13 (1972) (noting that "[t]here are compelling reasons why a freely negotiated private international agreement, unaffected by fraud, undue influence, or overweening bargaining power, such as that involved here, should be given full effect").

¶ 34    Additionally, forum selection clauses have been held to apply not merely to contract claims involving the terms of the contract in which the clause appears, but also to other claims that are otherwise connected to the contract, such as tort claims arising from the contract. *Hugel v. Corp. of Lloyd's*, 999 F.2d 206, 209 (7th Cir. 1993). " '[W]here the relationship between the parties is contractual, the pleading of alternative non-contractual theories of liability should not prevent enforcement of such a bargain [as to the appropriate forum for litigation].' " *Id.* (quoting *Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.*, 709 F.2d 190, 203 (3d Cir. 1983) (tort claims covered by forum selection clause)). See also *Omron Healthcare, Inc. v. Maclaren Exports Ltd.*, 28 F.3d 600, 603 (7th Cir. 1994) ("all disputes the resolution of which arguably depend on the construction of an agreement 'arise out of' that agreement for purposes of [a forum selection clause]").

¶ 35    Moreover, in Illinois, forum selection clauses are presumed valid and enforceable, unless proven otherwise by the party contesting their application. "A forum selection agreement reached through arm's-length negotiation between experienced and sophisticated businessmen should be honored by them and enforced by the courts, absent some compelling and countervailing reason for not enforcing it." *Mellon First United Leasing v. Hansen*, 301 Ill. App. 3d 1041, 1045 (1998). The Spanish defendants have raised no argument that the forum selection clause at issue in this case should not be enforced because it was unreasonable or otherwise invalid. As such, we consider the forum selection clause at issue to be *prima facie* valid and enforceable.

¶ 36    Although the Spanish defendants were not signatories to the amended cooperation agreement in the present case, courts have determined that a nonparty to a contract containing a forum selection clause can nonetheless be bound by that clause where the nonsignatory is " 'closely related' to the dispute such that it becomes 'foreseeable' that it will be bound." *Hugel*, 999 F.2d at 209. The nonsignatory need not also be deemed a third-party beneficiary of the contract in order for a court to find that the forum selection clause applies to it, although third-party beneficiary status "would, by definition, satisfy the 'closely related' and 'foreseeability' requirements." *Id.* at 210 n.7. In *Hugel*, for example, the court dismissed the plaintiffs' complaint for improper venue based on a forum selection clause (designating

England as the forum) contained in an agreement signed by the plaintiff president. *Id.* at 209-11. The court found that the other two plaintiffs, who were not parties to the agreement, were bound by the clause because they were "closely related." *Id.* The court reasoned that, in addition to being president and chairman of the other two plaintiffs–a brokerage firm and a subsidiary–the plaintiff president also owned 99% of the brokerage firm, which in turn wholly owned the subsidiary, and the president had involved the other two plaintiffs in the dispute. *Id.* at 210.

¶ 37    Similarly, in *Manetti-Farrow, Inc. v. Gucci America, Inc.*, 858 F.2d 509, 513-15, 514 n.5 (9th Cir. 1988), a forum selection clause designating Italy as the forum in the plaintiff's contract with an Italian subsidiary of Gucci was enforceable not only against the plaintiff, but also as to the nonsignatory defendants (the Italian Gucci parent and a United States subsidiary). The court held that "a range of transaction participants, parties and non-parties, should benefit from and be subject to forum selection clauses. [Citations.]" (Internal quotation marks omitted.) *Id.* at 514 n.5. The nonsignatory defendants (the Italian Gucci parent and the United States subsidiary) were subject to the forum selection clause because "the alleged conduct of the non-parties is so closely related to the contractual relationship that the forum selection clause applies to all defendants." *Id.*

¶ 38    We note that, in contrast to our present situation, *Hugel* and *Manetti-Farrow* involved enforcing a forum selection clause against a signatory plaintiff, or closely related nonsignatory plaintiff, and it did not appear that any nonsignatory defendants contested its application. Additionally, *Hugel* and several of the cases discussed and relied on by the circuit court and Solargenix involved motions to dismiss for improper venue, not for lack of personal jurisdiction. It is therefore particularly helpful for our purposes to examine cases involving challenges to personal jurisdiction by defendants who were not signatories to contracts containing a forum selection clause, but the clauses were nevertheless found to bind them, even though these cases originate from other jurisdictions.

¶ 39    The first is an unpublished memorandum opinion and order from the United States District Court for the Northern District of Illinois, *FCStone, LLC v. Adams*, No. 10 C 508, 2011 WL 43080 (N.D. Ill. Jan. 6, 2011).[10] In that case, the defendant husbands opened a joint trading account with the plaintiff, a futures commission merchant, and they executed an account agreement. *Id.* at *1. After the defendant husbands accumulated a deficit, they entered into a forbearance agreement with the plaintiff to assign their tax refunds to it; the agreement included a forum selection clause designating Illinois. *Id.* The wives of the husbands sued the husbands and the plaintiff in New York, arguing that the husbands had assigned only their one-half shares of the tax refunds to the plaintiff. *Id.* at *2. In Illinois, the plaintiff sued the husbands for breach of contract and fraud and for a declaration that the wives are not entitled to one-half of the refunds. *Id.* at *4. The wives, defendants in the Illinois action, then moved to dismiss the Illinois case for lack of personal jurisdiction. *Id.* at *1. The plaintiff countered that the court had specific jurisdiction over the wives in Illinois based on the forum selection clause. *Id.* at *3. The court held that the wives, although nonsignatories to the forbearance

---

[10]We recognize that "[u]npublished federal decisions are not binding or predecential in Illinois courts." *King's Health Spa, Inc. v. Village of Downers Grove*, 2014 IL App (2d) 130825, ¶ 63. However, "nothing prevents this court from using the same reasoning and logic as that used in an unpublished federal decision" where we find it to be persuasive. *Id.*

agreement, were so closely related to the plaintiff's dispute and the forbearance agreement that the wives were bound by the forum selection clause in the husbands' agreement because they were closely related to it. *Id.* The court noted that the wives' interest in the dispute was derivative of and identical to the husbands' interests. *Id.*

¶ 40     In another case involving a challenge to personal jurisdiction, *Tate & Lyle Ingredients Americas, Inc. v. Whitefox Technologies USA, Inc.*, 98 A.D.3d 401 (N.Y. App. Div. 2012), the New York appellate court affirmed the denial of the parent company/counterdefendant's motion to dismiss the defendant/counterplaintiff's counterclaims based on lack of personal jurisdiction. The court held that the nonsignatory parent company/counterdefendant was bound by the forum selection clause in its wholly owned plaintiff subsidiary's licensing contract with the defendant/counterplaintiff because the parent had a "sufficiently close relationship with the signatory *and* the dispute to which the forum selection clause applies." (Emphasis in original.) *Id.* at 401-03 (citing *Hugel*, 999 F.2d at 209, and *Manetti-Farrow*, 858 F.2d at 514 n.5). The court reasoned that binding closely related parties to a forum selection clause promoted "stable and dependable trade relations" and that it would be inconsistent to permit an entity to escape such a clause by acting through another entity. (Internal quotation marks omitted.) *Id.* at 402. The parent company/counterdefendant's involvement with the plaintiff subsidiary included that the CEO of the parent made decisions regarding instituting suit and the events giving rise to the litigation, and that the two entities consulted with each other and were intimately involved in making decisions with respect to the licensing agreement. *Id.* at 403. The court concluded that this involvement was "far more than a parent company's mere approval of a contract" and it was reasonably foreseeable that the forum selection clause would apply to the parent company. *Id.*

¶ 41     Finally, following oral arguments, Solargenix moved to cite as supplemental authority a case that was recently decided by the United States District Court for the District of Columbia, *Sabre International Security v. Torres Advanced Enterprise Solutions, LLC*, No. 11-806 (D.D.C. June 16, 2014). In that case, the plaintiff Sabre, an Iraqi private security contractor, entered into an agreement with the defendant Torres, a domestic private security contractor, to compete as a team to seek the award of contracts to provide security for the United States government in Iraq. *Id.* at *3. The plaintiff alleged that the individual defendants later secretly decided to terminate the agreement with Sabre and directly complete with it, causing defendant Torres to breach the agreement. *Id.* at *4. The individual defendants, who were not residents of the District of Columbia, moved to dismiss for lack of personal jurisdiction. *Id.* at *5-6. The court found that it did not have general or specific jurisdiction over the individual defendants. *Id.* at *15-24. The court noted that it declined to consider the plaintiff's argument that the forum selection clause in its agreement with Torres constituted a forum "contact" for purposes of the "minimum contacts" analysis relating to specific jurisdiction, because forum selection clauses were typically "considered to be a consent to the exercise of personal jurisdiction in a particular forum and [are] governed by contract principles rather than the minimum contacts framework." *Id.* at *22-23. Based on contract law, the court concluded that it had jurisdiction over the individual defendants, who included the CEO and sole shareholder, the vice president, the chief financial officer (CFO), and a project and program manager who all had extensive authority and involvement in the decisions and operation of Torres, and who were all nonparties to the contract including the forum selection clause. *Id.* at *28-34. The court reasoned that it had the authority to bind a nonparty to a forum selection clause where the

" 'alleged conduct of the nonparties is closely related to the contractual relationship, a range of transaction participants, parties and non-parties, should benefit from and be subject to forum selection clauses.' " *Id.* at \*24-25 (quoting *Holland American Line, Inc. v. Wärtsilä North America, Inc.*, 485 F.3d 450, 456 (9th Cir. 2007)). The court noted that other cases had expressly found that a nonparty was subject to a forum selection clause where the nonparty was so closely related to the dispute that it became foreseeable that the nonparty would be bound by the clause. *Id.* at \*27. The court reasoned that forum selection clauses could otherwise be easily evaded if courts were not willing to enforce them against nonparties. *Id.* at \*25 (citing *Adams v. Raintree Vacation Exchange, LLC*, 702 F.3d 436, 441 (7th Cir. 2012)).

¶ 42    The touchstone illustrated by these cases is that a court may exercise personal jurisdiction over a defendant by enforcing a forum selection clause against it, even though it was not a signatory to the contract containing the clause, where it was closely related to the dispute such that it became foreseeable that the nonsignatory would be bound, regardless of whether the nonsignatory is a defendant or a plaintiff in the subject litigation. Where there is a sufficiently close relationship between the nonsignatory and the dispute and the parties, it does not defy the nonsignatory's reasonable expectations that it would be bound by the clause, just as the signatory parties are. A nonsignatory impliedly consents to the forum selection clause via its connections with the dispute, the parties, and the contract or contracts at issue.

¶ 43    Turning to the language of the forum selection clause in the present case, we find that the present dispute falls within its scope. As stated, the clause provided that the parties consented to jurisdiction in Illinois "with regard to any actions, claims, disputes or proceedings relating to this Agreement, or any document delivered hereunder or in connection herewith, or any transaction arising from or connected to any of the foregoing." Solargenix alleged that defendants breached the cooperation agreement and letter of adhesion, fraudulently induced them to enter into the agreements, tortiously interfered with contractual rights (*i.e.*, Acciona causing the other defendants to breach the cooperation agreement), and unjustly benefited from these alleged torts. It is clear that Solargenix's claims arise out of and are related to the amended cooperation agreement and the parties' joint venture.

¶ 44    Additionally, we agree with Solargenix's argument that the letter of adhesion constitutes "any document delivered hereunder or in connection herewith" the amended cooperation agreement, and consequently, also falls within the scope of the forum selection clause. The letter of adhesion bore the same date as the other joint venture agreements. The amended cooperation agreement expressly referenced the letter of adhesion in at least two different places: in section III, paragraph A, and section V, paragraph D. In section III, paragraph A, it refers to the letter of adhesion as being "attached" to the cooperation agreement: "The parties acknowledge that Acciona Energia, SA ('Acciona') has agreed that it is bound by this agreement *through the letter of adhesion attached hereto* \*\*\*." (Emphasis added.) Section V, paragraph D, provides that "[t]he parties acknowledge that Acciona has agreed that it is bound by the agreements in paragraphs A [(the Worldwide Investment Vehicle provision)], B [(the Worldwide Thermosolar Development provision)], and D above through the Letter of Adhesion." These sections show that the letter of adhesion was closely connected to the amended cooperation agreement.

¶ 45    Considering the broad language in the forum selection clause in referring to "any" dispute, claim, document, or transaction connected to the agreement, we further conclude that the forum selection clause was essentially incorporated into all of the provisions of the amended

cooperation agreement. This obviously included those provisions specifically adopted in the letter of adhesion, which set forth one the primary purposes of the joint venture–to form a joint investment vehicle for the future development of thermosolar power generation projects worldwide. Consequently, the allegations of breach, fraudulent inducement, tortious interference, and unjust enrichment related to these obligations necessarily turns on reference to the letter of adhesion and cooperation agreement, and are bound by the forum selection clause.

¶ 46     With the foregoing in mind, we first address personal jurisdiction as it relates to Acciona Energia. As stated, in the letter of adhesion, Acciona Energia agreed to be bound by and comply with the provisions of the amended cooperation agreement which comprised a primary purpose of the joint venture. These provisions necessarily incorporated the broad terms of the forum selection clause. We find that, by agreeing to these key paragraphs, Acciona Energia thereby also impliedly agreed to jurisdiction in Illinois. Significantly, no alternative forum was designated in the letter of adhesion.

¶ 47     Additionally, the evidence adduced from discovery on the motion to dismiss demonstrated that, in addition to being a signatory to the letter of adhesion, Acciona Energia was closely related to the joint venture contracts, the dispute, and the United States subsidiaries. As asserted by Solargenix, at the time the joint venture was formed, only the Spanish defendants had the international focus contemplated by the cooperation agreement and the ability to pursue the objective of the venture–to develop thermosolar projects worldwide jointly with Solargenix. To that end, Acciona Solar Energy was created shortly before the joint venture agreements were executed in order to hold stock in the joint venture entity, ASP, but it had no employees or business at the time, and still had no employees as of 2011, while Acciona North America had only six employees, limited its operations to North America, and was not in the thermosolar power business.[11] Additionally, as asserted by Solargenix, Acciona Energia's executive committee discussed and reviewed the investment, and the joint venture agreements were negotiated by senior officials from Acciona Energia, Alberto de Miguel (head of international business development for Acciona Energia) and Yolanda Herran (a lawyer for Acciona Energia), during numerous meetings in Chicago, and that Acciona Energia's CEO Esteban Morras designated de Miguel to negotiate.[12] Further, Acciona Energia "seconded" employees to the United States subsidiaries, several individuals from Spain served on the boards of the United States subsidiaries, and some individuals held positions in both Acciona Energia and ASP. For example, de Miguel was a senior Acciona Energia employee who also

---

[11]De Miguel testified in his deposition that Acciona North America and Acciona Solar Energy did not have any involvement in solar thermal projects other than through ASP, and neither did business outside of North America. He testified that at the time he signed the joint venture agreements, Acciona Solar Energy's business was to hold shares and that it was "created for this agreement. The company didn't exist. It was created for this particular agreement to hold the shares of the Nevada Solar One set of companies ***."

[12]De Miguel also testified he agreed that he was the principal negotiator from the "Acciona side." He signed the agreements on behalf of Acciona North America, but he also held a position with Acciona Energia. He testified that Yolanda Herran was a lawyer employed by Acciona Energia, she did not hold a position with the United States subsidiaries, and she also assisted with the negotiations in Chicago.

served as chairman of ASP, and Paxti Landa was an Acciona Energia employee who acted as ASP's general manager.[13] Moreover, Solargenix asserted that Acciona Energia financially supported the subsidiaries and indemnified Boulder City in connection with Nevada Solar One, even though one of the United States subsidiaries was the actual owner of the thermosolar power plant.

¶ 48    Next, with respect to Acciona specifically, we similarly conclude that the evidence showed it was closely related to the dispute and the parties such that it was foreseeable it would be bound by the forum selection clause even if, on paper, it was not a signatory to the amended cooperation agreement or the letter of adhesion. As noted, Acciona and Acciona Energia were the only entities capable of pursuing the international expansion and implementation of Solargenix's thermosolar technology. As asserted by Solargenix, Acciona's corporate development division was involved in due diligence with respect to the joint venture transaction and Acciona approved of the joint venture agreements.[14] Solargenix alleged that Jose Manuel Entrecanales, chairman and CEO of Acciona, was personally involved in the decision to invest in the joint venture, approved the initial decision to enter the joint venture,[15] approved the name change to ASP, and he also spoke at the ground-breaking and dedication ceremonies for Nevada Solar One and stated at the ceremony that it was Acciona's project.

¶ 49    According to Solargenix and as supported by its exhibits, further evidence of Acciona's close relationship was evidenced by its behavior following formation of the joint venture. Solargenix alleged that senior officials of Acciona made employment and compensation decisions for ASP, determined ASP's strategy, and decided which projects ASP would pursue. For example, Frank Gelardin, the head of international business for Acciona, was involved in ASP's employment and compensation issues, among other issues.[16] Solargenix pointed out that none of these individuals held positions with the United States Acciona subsidiaries or ASP, and thus acted solely in their capacity as representatives of Acciona. Solargenix also argued that through discovery, Acciona identified 103 employees, officers, directors, or representatives of Acciona and Acciona Energia who traveled to Illinois to discuss ASP, Mitsubishi, and solar power and renewable energy, including Entrecanales and Morras. Further, the president of Acciona Energy North America lived and worked in Illinois and also

---

[13]De Miguel testified that Patxi Landa was paid by Acciona Energia. De Miguel also testified that Acciona Energia CEO Esteban Morras had to ratify the bonus incentive plan for employees of ASP.

[14] In support, Solargenix provided emails between Acciona and Acciona Energia officials discussing the investment opportunity and presenting it to the investments committee of Acciona, and an email from de Miguel indicating that he had to send a Term Sheet regarding the proposed venture to Acciona for approval before sending it to Solargenix officials.

[15]Solargenix provided emails from Acciona Energia CEO Morras to Acciona CEO Entrecanales (among others), and emails from Entrecanales to Morras discussing various aspects of the proposed joint venture.

[16]Solargenix provided emails from Acciona Energia CEO Morras, Frank Gelardin, the head of international business for Acciona, along with Peter Duprey and de Miguel regarding employment and compensation matters of ASP, discussing and deciding on ASP's business strategy, goals, and opportunities, and discussing meetings with John Myles in which Gelardin planned to participate.

served as Acciona's "Area General Director for the United States," and reported directly to Acciona CEO Entrecanales.

¶ 50    Given the structure of the joint venture and its attendant agreements such as the cooperation agreement and the letter of adhesion, in addition to the other evidence, we therefore agree with the circuit court's determination that the Spanish defendants were so "closely related" to the dispute, the parties, and the various agreements that it was foreseeable that they would be bound by the forum selection clause. Indeed, it is because of Acciona's close involvement with the joint venture that Solargenix alleges Acciona was allowed to control ASP and stifle potential opportunities for the joint venture, while Acciona pursued the opportunities for itself. Neither Acciona nor Acciona Energia can convincingly claim to have been surprised to find themselves in an Illinois courtroom stemming from claims arising from the joint venture agreements with Solargenix.

¶ 51    Illustrative of the present circumstances is *American Patriot Insurance Agency, Inc. v. Mutual Risk Management, Ltd.*, 364 F.3d 884 (7th Cir. 2004), where the Seventh Circuit found that all of the contracts were one "package" or pieces of a jigsaw puzzle and the dispute concerned the "package" of contracts. *Id.* at 889. The defendants moving to dismiss were affiliates of the defendant which had signed the shareholder agreement, which contained a forum selection clause, and they were signatories to other contracts with plaintiff, and they all worked together on the insurance program. *Id.* at 888-89. The court held that the forum selection clause applied to the moving defendants, reasoning that "no reason has been suggested for why the parties would have wanted disputes under that agreement to be litigated in Bermuda but not disputes under the other pieces of the jigsaw puzzle." *Id.* at 889. As in *American Patriot*, we can similarly state that no reason has been suggested for why the parties would want disputes under certain provisions of the amended cooperation agreement to be litigated in Illinois, but not other disputes arising under other pieces of the jigsaw puzzle, *i.e.*, the letter of adhesion or the other parties closely connected to the dispute.

¶ 52    We additionally note that the Spanish defendants cited two cases as supplemental authority during the pendency of this appeal. Because we are finding that specific jurisdiction existed based on their close relationship to the dispute and the forum selection clause, we need not discuss the two cited cases, as they did not involve the exercise of personal jurisdiction based on a forum selection clause. *Daimler AG v. Bauman*, 571 U.S. ___, 134 S. Ct. 746 (2014), dealt with whether the court had general jurisdiction over a foreign parent company based on its domestic subsidiary's contacts with the forum, where the domestic subsidiary was unrelated to the dispute and the dispute involved actions occurring in another country. Further, *Walden v. Fiore*, 571 U.S. ___, 134 S. Ct. 1115 (2014), involved whether the court could exercise specific personal jurisdiction over an individual in an intentional tort case where the plaintiff, and not the defendant's actions, provided the only contact with the forum.

¶ 53                                    III. CONCLUSION

¶ 54    For the reasons stated above, we affirm the circuit court's order denying defendant's motion to dismiss.

¶ 55    Affirmed.